# ILLINOIS *v.* ILLINOIS CENTRAL RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 28. Argued March 15, 1901.—Decided February 3, 1902.

This case was before this court in *Illinois Central Railroad Company v. Illinois*, 146 U. S. 387, and in that case the history of the litigation relating to the property involved is fully disclosed, and the court found that the structures made in the lake by the Railroad Company did not extend beyond the point of practical navigability; and upon the return of this cause to the Circuit Court, nothing was before that court except to inquire whether the structures erected by the Railroad Company extended into the lake beyond the point of practical navigability.

There was no error in holding that, in view of the manner in which commerce was conducted on the lake during the period of the investigation below, the structures erected by the Railroad Company did not extend into the water beyond the point of practical navigability.

The Circuit Court and the Circuit Court of Appeals having concurred in finding that the structures in question did not extend into the lake beyond the point of practical navigability, the decree below should not be disturbed, unless it was clearly in conflict with the evidence.

THE case is stated in the opinion of the court.

*Mr. John H. Hamline* for appellant. *Mr. Edward C. Akin, Mr. Frank H. Scott* and *Mr. Frank E. Lord* were on his brief.

*Mr. John N. Jewett* and *Mr. Benjamin F. Ayer* for appellees. *Mr. J. M. Dickinson* was on their brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case has been heretofore in this court. *Illinois Central Railroad Company* v. *Illinois*, 146 U. S. 387. The decree then under review was affirmed in all respects except one, and as to that one the cause was remanded for further investigation of the facts upon which it depended.

The case involved the asserted ownership by the Illinois Central Railroad Company of certain piers, docks and wharves constructed by it on the lake front of the city of Chicago, east of Michigan avenue.

The State contended that the structures in question were erected, without authority of law, on lands belonging to it, and that the decree now before us was erroneous in not so declaring.

The Railroad Company contended that the mandate of this court on the former appeal left open for consideration by the Circuit Court only one question, namely, whether those structures extended beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on Lake Michigan ; and that that issue of fact having been found in its favor, the Circuit Court could not properly have passed any other decree than one confirming the company's title to such structures.

The history of the litigation relating to this property is fully disclosed in *Illinois Central Railroad Company* v. *Illinois*, above cited. But it will be appropriate and will contribute to a clear understanding of the present appeal if the essential facts be restated in this opinion.

In the year 1883 an information was filed in the Circuit Court of Cook County, Illinois, by the people of that State against the Illinois Central Railroad Company, the city of Chicago and the United States of America. That case was removed into the Circuit Court of the United States for the Northern District of Illinois, and a motion to remand it to the state court was overruled. 16 Fed. Rep. 881. In the same case the city of Chicago filed a cross-bill against the State and its co-defendants. At the same time there was pending in the Circuit Court of the United States for the same District an in-

formation in equity filed by the Government against the Illinois Central Railroad Company, the Michigan Central Railroad Company, the Chicago, Burlington and Quincy Railroad Company, the Baltimore and Ohio Railroad Company, and the city of Chicago.

At the hearing of those causes in the Circuit Court certain maps were used; one being known as the map of "Fort Dearborn Addition to Chicago" made by direction of the Secretary of War, under the authority of an act of Congress, approved March 3, 1819; the other being known as the Morehouse Map. Both maps were made part of the opinion of this court in *Illinois Central Railroad* v. *Illinois,* and for convenience are here reproduced:

*State of Illinois* vs. *Illinois Central Railroad.*

*State of Illinois* vs. *Illinois Central Railroad.*

## MOREHOUSE MAP.

The questions involved in the above suits are indicated by the following extract from the opinion of the Circuit Court at the original hearing: " The State, in the original suit, asks a decree establishing and confirming her title to the bed of Lake Michigan, and her sole and exclusive right to develop the harbor of Chicago by the construction of docks, wharves, etc., as against the claim by the railroad company that it had an absolute title to said submerged lands, described in the act of 1869,[1]

---

[1] " An act in relation to a portion of the submerged lands and Lake Park grounds, lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago. Passed over veto, April 16, 1869." The third section of that act reads:

" § 3. The right of the Illinois Central Railroad Company under the grant from the State in its charter, which said grant constitutes a part of the consideration for which the said company pays to the State at least seven per cent of its gross earnings, and under and by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident to such grant, appropriation, occupancy, use and control, in and to the lands, submerged or otherwise, lying east of the said line, running parallel with and 400 feet east of the west line of Michigan avenue, in fractional sections ten and fifteen, township and range as aforesaid, is hereby confirmed; and all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south and near to the round-house and machine-shops of said company, in the South division of the said city of Chicago, are hereby granted in fee to the said Illinois Central Railroad Company, its successors and assigns: provided, however, that the fee to said lands shall be held by said company in perpetuity, and that the said company shall not have power to grant, sell, or convey the fee to the same; and that all gross receipts from use, profits, leases or otherwise of said lands, or the improvements thereon, or that may hereafter be made thereon, shall form a part of the gross proceeds, receipts and income of the said Illinois Central Railroad Company, upon which said company shall forever pay into the state treasury, semi-annually, the per centum provided for in its charter, in accordance with the requirements of said charter: and provided, also, that nothing herein contained shall authorize obstructions to the Chicago harbor, or impair the public right of navigation; nor shall this act be construed to exempt the Illinois Central Railroad Company, its lessees or assigns, from any act of the General Assembly which may be hereafter passed regulating the rates of wharfage and dockage to be charged in said harbor: and provided, further, that any of the lands hereby granted to the Illinois Central Railroad Company, and the improvements now, or

and the right—subject to the paramount authority of the United States in respect to the regulation of commerce between the States—to fill the bed of the lake, for the purpose of its business, east of and adjoining the premises between the river and the north line of Randolph street, and also north of the south line of lot 21; and also the right, by constructing and maintaining wharves, docks, piers, etc., to improve the shore of the lake, for the purposes of its business, and for the promotion, generally, of commerce and navigation. The State, insisting that the company has, without right, erected, and proposes to continue to erect, wharves, piers, etc., upon the domain of the State, asks that such unlawful structures be directed to be removed, and the company enjoined from constructing others. The city, by its cross bill, insists that since June 7th, 1839, when the map of Fort Dearborn addition was recorded, it has had the control and use for public purposes of that part of section 10 which lies east of Michigan avenue, and between Randolph street and fractional section 15; and that, as successor of the town of Chicago, it has had possession and control since June 13th, 1836, when the map of fractional section 15 addition was recorded, of the lands in that addition north of block 23. It asks a decree declaring that it is the owner in fee, and of the riparian rights thereunto appertaining, of all said lands, and has, under existing legislation, the exclusive right to develop the harbor of Chicago by the construction of docks, wharves and levees, and to dispose of the same, by lease or otherwise, as authorized by law; and that the railroad company be enjoined from interfering with its said rights and ownership. The relief sought by the United States is a decree declaring the ultimate title and property in the 'Public Ground' shown on the plat of the Fort Dearborn addition, south of Randolph street, and also in the open space shown on the plat of fractional section 15 addition, to be in the United

---

which may hereafter be, on the same, which shall hereafter be leased by said Illinois Central Railroad Company to any person or corporation, or which may hereafter be occupied by any person or corporation other than said Illinois Central Railroad Company, shall not, during the continuance of such leasehold estate or of such occupancy, be exempt from municipal or other taxation."

States, with the right of supervision and control over the harbor and navigable waters aforesaid; that the railroad companies and the city be enjoined from exercising any right, power or control over said grounds, or over the waters or shores of the lake; that the Illinois Central Railroad Company be restrained from making or constructing any piers, wharves or docks, and from driving piles, building walls or filling with earth or other materials in the said lake, or from using any made-ground, or any piers, wharves or other constructions made or built by or for it in or about the outer harbor, to the east of the 200-feet strip of its way-ground, or from taking or exacting any toll for such use; and that the Illinois Central Railroad Company be required to abate and remove all obstructions placed by it in said outer harbor, and to quit possession of all lands, waters and made-ground taken and held by it without right as aforesaid. The State, the city and the General Government all unite in contending that the Lake Front Act of 1869 is inoperative and void." 33 Fed. Rep. 730, 750.

A final decree was rendered in the Circuit Court on the 24th day of September, 1888. By that decree it was adjudged that the fee of certain streets, avenues and grounds was in the city of Chicago in trust for public use; and that the city of Chicago, as riparian owner of such grounds on the east or lake front of said city, between the north line of Randolph street and the north line of block twenty-three, each of the lines being produced to Lake Michigan, and in virtue of authority to that end conferred by its charter, had, among other powers, the power to establish, construct, erect and keep in repair on the lake front, east of such premises, within the lines given, and in such manner as would be consistent with law, public landing places, wharves, docks and levees, subject, however, in the execution of that power, to the authority of the State by legislation to prescribe the lines beyond which piers, docks, wharves and other structures, other than those erected by the General Government, might not be extended into the waters of the harbor that were navigable in fact, and to such supervision and control as the United States might rightly exercise in and over such harbor, and subject also to the enjoyment by the Illinois

Central Railroad Company of the rights then to be defined and described.

It was further adjudged:

" *That the Illinois Central Railroad Company* is the owner in fee of all the wharves, piers and other structures erected by it in the city of Chicago, *east of Michigan avenue, south of Chicago River, and north of the north line of Randolph street,* extended eastwardly as shown upon said Morehouse map, including the station grounds lying west of the slip C, the pier marked C, lying east of slip C, and represented upon the Morehouse map to have been built in 1867, *and piers 1, 2 and 3, lying east of pier C last mentioned, and represented upon said map to have been built as follows : Pier 1 in 1872 and 1873, pier 2 in 1881, and pier 3 in 1880, and is also entitled to the use, for the purposes of its business, of the slips marked on said Morehouse map.*

" That said company is likewise the owner in fee of all the wharves, piers and other works made and constructed by it in the city of Chicago, east of its main tracks, *between the north line of block 23, in fractional section 15 addition to Chicago, and the center line of Sixteenth street extended, including the pier or line of piling represented upon the said Morehouse map to have been built in 1870, and the station grounds lying west of the said pier and contiguous thereto ; also of the wharf or pier projecting into the lake from the grounds last mentioned, and represented upon the said Morehouse map to have been built in 1885 ;* which said wharves, piers and other works so constructed *and so far as constructed* by the said Illinois Central Railroad Company, as aforesaid, are lawful structures and not encroachments upon the domain of the State of Illinois *or upon the public right of navigation,* or upon the property interests or estate of the said city of Chicago."

" And the court doth further find and declare, and it is hereby adjudged and decreed, that the third section of the act of the General Assembly of the State of Illinois, passed over the Governor's veto April 16th, 1869, entitled, ' An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan, on the eastern

frontage of the city of Chicago,' so far, at least, as it confirms 'the right of the Illinois Central Railroad Company under the grant from the State in its charter, . . . and under and by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident to such grant, appropriation, occupancy, use and control in and to the lands, submerged or otherwise, lying east of the said line running parallel with and four hundred feet east of the west line of Michigan avenue in fractional sections ten and fifteen,' is a valid and constitutional exercise of legislative power and legalizes as well what was done by said company prior to April 16th, 1869, in the way of filling in the lake and constructing wharves, piers, tracks, warehouses and other works between the Chicago River and the north line of Randolph street extended eastwardly, as its occupancy and use for way ground of the two said triangular pieces of ground immediately south of Randolph street; and that the subsequent act of the General Assembly of Illinois, passed April 15th, 1873, in so far as it sought by repealing the said act of April 16th, 1869, to revoke or annul said confirmatory clause of the last named act, was void under the Constitution both of Illinois and of the United States; but the court is of opinion, and so adjudges and decrees, that the said act of April 15th, 1873, repealing said act of April 16th, 1869, had the effect in law to withdraw from said railroad company the grant to it, its successors and assigns, by the third section of said act of April 15th (16th), 1869, of 'all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan and lying east of the tracks and breakwater of the Illinois Central Railroad Company for the distance of one mile, and between the south line of the pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south of and near to the round-house and machine shops of said company, in the south division of said city of Chicago;' and to reinvest the State with such right and title as it had in and to said premises prior to the passage of said act of April 16th, 1869; and said repealing act had the further effect to withdraw from said company the additional power conferred upon it by said act of April 16th, 1869, to improve the harbor of Chicago, and

to engage in the business of constructing and maintaining wharves, piers and docks for the benefit of commerce and navigation generally, and not in the prosecution of its business, as defined and limited by its original charter and the laws of the State, saving, however, to said company as unaffected by said repeal the right to hold and use as part of its way-ground or right of way, and not otherwise, the before-mentioned part of the submerged lands east of its breakwater between Monroe and Washington streets extended eastwardly, which was reclaimed from the lake in 1873, presumably upon the faith of the act of 1869, and is marked on the Morehouse map with the words ' built 1873.'

" It is further ordered, adjudged and decreed that the defendant, the Illinois Central Railroad Company, be, and it is hereby, perpetually enjoined and restrained from erecting structures in or filling with earth or other materials any portion of the bed of Lake Michigan *as it now exists and as shown on said Morehouse map east or in front of said fractional sections ten and fifteen*—that is, east or in front of the grounds *now occupied and used by it between Chicago River and the north line of Randolph street extended eastwardly*, or east or in front of the grounds *now occupied and used by it between the north line of Randolph and the center line of Sixteenth Street, each extended eastwardly*, except that said company *may complete the slip or basin already commenced* immediately north of Sixteenth street extended, with a wharf on each side of it not exceeding one hundred feet in width each, where vessels coming into such slip or basin may load and unload, and upon which tracks of the company may be laid ; and it is considered and ordered by the court that the Illinois Central Railroad Company and the city of Chicago each pay one-half of the costs herein, and that execution issue therefor."

The railroad company not having obtained all it claimed, the cause was brought by it to this court, which affirmed the decree of the Circuit Court *except as modified in certain particulars*, to be presently indicated. *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387, 449, 464.

Referring to the third section of the act of the Illinois legis-

lature of 1869 this court said : " The section in question has two objects in view : one was to confirm certain alleged rights of the railroad company under the grant from the State in its charter and under and ' by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident' thereto, in and to the lands submerged or otherwise lying east of a line parallel with and four hundred feet east of the west line of Michigan avenue, in fractional sections ten and fifteen. The other object was to grant to the railway company submerged lands in the harbor. The confirmation made, whatever the operation claimed for it in other respects, cannot be invoked so as to extend the riparian right which the company possessed, from its ownership of lands in sections ten and fifteen on the shore of the lake. Whether the piers or docks constructed by it, *after the passage of the act of* 1869, extended beyond the point of navigability in the waters of the lake, must be the subject of judicial inquiry upon the execution of this decree in the court below. If it be ascertained upon such inquiry and determined that such piers and docks do not extend beyond the point of *practical* navigability, the claim of the railroad company to their title and possession *will be confirmed ;* but if they or either of them are found on such inquiry to extend beyond the point of such navigability, then the State will be entitled to a decree that they, or the one thus extended, be abated and removed to the extent shown, or for such other disposition of the extension as, upon the application of the State and the facts established, may be authorized by law."

The modifications in the original decree of 1888 which this court directed to be made are distinctly shown by the following extract from our opinion :

" It follows from the views expressed, and it is so declared and adjudged, that the State of Illinois is the owner in fee of the submerged lands constituting the bed of Lake Michigan, which the third section of the act of April 16th, 1869, purported to grant to the Illinois Central Railroad Company, and that the act of April 15th, 1873, repealing the same is valid and effective for the purpose of restoring to the State the same control, domin-

ion and ownership of said lands that it had prior to the passage of the act of April 16th, 1869.

"But the decree below, as it respects the pier commenced in 1872, and the piers completed in 1880 and 1881, marked 1, 2 and 3, nea. Chicago River, and the pier and docks between and in front of Twelfth and Sixteenth streets, is *modified* so as to direct the court below to order such investigation to be made as may enable it to determine whether those piers erected by the company, by virtue of its riparian proprietorship of lots formerly constituting part of section 10, extend into the lake *beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake ;* and if it be determined upon such investigation that said piers, or any of them, do *not* extend beyond such point, *then* that the title and possession of the railroad company to such piers *shall be affirmed by the court ;* but if it be ascertained and determined that such piers, or any of them, do extend beyond such navigable point, *then* the said court shall direct the said pier or piers, *to the excess ascertained,* to be abated and removed, or that other proceedings relating thereto be taken on the application of the State as may be authorized by law ; and also to order that similar proceedings be taken to ascertain and determine whether or not the pier and dock, constructed by the railroad company in front of the shore between Twelfth and Sixteenth streets *extend beyond the point of navigability,* and *to affirm the title and possession of the company if they do not extend beyond such point,* and, if they do extend beyond such point, to order the abatement and removal of the excess, or that other proceedings relating thereto be taken on application of the State as may be authorized by law. *Except as modified in the particulars mentioned,* the decree in each of the three cases on appeal must be *affirmed,* with costs against the railroad company ; *and it is so ordered."* *Illinois Central Railroad* v. *Illinois,* 146 U. S. 387, 449, 464.

The mandate of this court embodied the above extract from its opinion, and upon the return of the causes to the Circuit Court the parties took additional proof on the single matter so reserved for investigation.

Upon final hearing in the Circuit Court, May, 1896, a decree was entered by which it was found and adjudged "that the said piers and docks referred to in the aforesaid judgment and mandate of the Supreme Court and there described as piers marked 1, 2, and 3, near Chicago River, and the piers and docks constructed by the said railroad company in front of the shore between Twelfth and Sixteenth streets, all in the city of Chicago, in the State of Illinois, do not extend, nor does either of them extend, into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake. It is therefore ordered, adjudged and decreed that the title and possession of the said Illinois Central Railroad Company to the said piers, and each of them and every part thereof, be, and the same is hereby, affirmed."

That decree was affirmed by the Circuit Court of Appeals, 91 Fed. Rep. 955, and the case is here upon appeal by the State of Illinois. No appeal was taken by the United States or by the city of Chicago.

In view of these facts what matters are open for consideration on this appeal? This question was fully discussed at the bar. It is not in our opinion difficult of solution.

We have seen that by the original decree of the Circuit Court rendered September 24, 1888, the railroad company was adjudged to be the owner in fee of the particular structures in question, namely, the piers marked 1, 2 and 3 on the Morehouse map, as well the piers and docks between and in front of Twelfth and Sixteenth streets, and were entitled to use and control them in its business. This court held that view to be correct, *provided* the structures did *not* "extend into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." If, upon investigation, it was found that the structures referred to did, in fact, extent beyond that point, then the Circuit Court was directed to make such decree as would effect their removal "to the excess ascertained;" and if the contrary was found to be the case, then a decree was to be entered recognizing the rights of the railroad company in respect of the structures in question to be such as were declared by the original decree of the Circuit Court.

As already shown, the Circuit Court found, upon full inquiry, that the structures did not extend beyond the point of practical navigability, having reference to the manner in which commerce was conducted on the lake; and in conformity with the mandate a decree was entered confirming the title of the railroad company.

In *Sibbald* v. *United States*, 12 Pet. 488, 492, this court said: " A final decree in chancery is as conclusive as a judgment at law. 1 Wheat. 355; 6 Wheat. 113, 116. Both are conclusive on the rights of the parties thereby adjudicated. No principle is better settled, or of more universal application, than that no court can reverse or annul its own final decrees or judgments, for errors of fact or law, after the term in which they have been rendered, unless for clerical mistakes, 3 Wheat. 591; 3 Peters, 431; or to reinstate a cause dismissed by mistake; 12 Wheat. 10; from which it follows, that no change or modification can be made, which may substantially vary or affect it in any material thing. . . . Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it upon any matter decided on appeal for error apparent; or intermeddle with it, further than to settle so much as has been remanded. After a mandate, no rehearing will be granted, and on a subsequent appeal, nothing is brought up, but the proceeding subsequent to the mandate. 5 Cranch, 316; 7 Wheat. 58, 59; 10 Wheat. 443."

In *Roberts* v. *Cooper*, 20 How. 467, 481, the court said: " On the last trial, the Circuit Court was requested to give instructions to the jury contrary to the principles established by this court on the first trial, and nearly all the exceptions now urged against the charge are founded on such refusal. But we cannot be compelled on a second writ of error in the same case to review our own decision on the first. It has been settled by the decisions of this court, that after a case has been brought here and decided, and a mandate issued to the court

below, if a second writ of error is sued out, it brings up for re-vision nothing but the proceedings subsequent to the mandate. None of the questions which were before the court on the first writ of error can be reheard or examined upon the second. To allow a second writ of 'error or appeal to a court of last resort on the same questions which were open to dispute on the first, would lead to endless litigation. In chancery, a bill of review is sometimes allowed on petition to the court; but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate on chances from changes in its members. . . . We can now notice, therefore, only such errors as are alleged to have occurred in the decisions on questions which were peculiar to the second trial." To the same effect are numerous cases, some of which are cited in the margin.[1]

It is clear, under the adjudged cases, that upon the return of this cause to the Circuit Court, nothing was before that court except to inquire whether the structures erected by the rail-road company, and specifically described in the opinion and mandate of this court, extended into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels was conducted on the lake. That matter, and nothing more, had been or could have been deter-mined by the final decree of the Circuit Court, and therefore on this appeal we can only inquire as to the soundness or unsound-ness of its conclusion upon the sole question reserved for investi-gation. We therefore do not stop to consider, as the appellant insists we should do, whether this court erred in any particular

---

[1] *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 355; *Browder* v. *McArthur*, 7 Wheat. 58; *Washington Bridge Co.* v. *Stewart*, 3 How. 413, 425; *Chaires* v. *United States*, 3 How. 611, 620; *Corning* v. *Troy Iron and Nail Factory*, 15 How. 451, 466; *Peck* v. *Sanderson*, 18 How. 42; *Whyte* v. *Gibbes*, 20 How. 541; *Ex parte Dubuque and Pacific Railroad*, 1 Wall. 69, 73; *Noonan* v. *Bradley*, 12 Wall. 121, 129; *Supervisors* v. *Kennicott*, 94 U. S. 498; *Stewart* v. *Salamon*, 97 U. S. 361; *Brooks* v. *Railroad Co.*, 102 U. S. 107; *Northern Pacific Railroad Co.* v. *Ellis*, 144 U. S. 458, 464; *Gaines* v. *Rugg*, 148 U. S. 228, 241; *Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 691; *New Orleans* v. *Citizens' Bank*, 167 U. S. 371, 396; *In re Sanford Fork and Tool Co.*, 160 U. S. 247.

in its opinion or judgment on the former appeal in respect of any matter then determined. Every matter embraced by the original decree of the Circuit Court and not left open by the decree of this court, was conclusively determined, as between the parties, by our former decree, and is not subject to reëxamination on this appeal.

We come, then, to consider the merits of the case as involved in the only question now before us, namely, whether the structures referred to extend beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake.

Judge Showalter in the Circuit Court found that the facts relating to the structures north of Randolph street and those between Twelfth and Sixteenth streets fully protected the railroad company under the rule prescribed by the mandate of this court. Referring to vessels of the largest class continuously used in lake navigation, he said : " Such vessels, when ladened, require from 16 to 20 feet of water in which to float. A vessel drawing more than 12 feet, as I find from the evidence in the case, would hardly reach the structure here in question in the ordinary stages of water, and in the lowest water vessels requiring more than 10 feet could not reach or land at these docks. Without being specific as to the exact depth of the water, I find that the two piers and docks between Twelfth and Sixteenth streets do not extend into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lakes, and I make the same finding as to the piers and docks north of Randolph street."

In the Circuit Court of Appeals, Judge Jenkins, speaking for the court, said : " The right [of the riparian owner] is a relative right, having relation, in the language of the Supreme Court in this cause, ' to the manner in which commerce in vessels is conducted on the lake.' To serve any useful purpose those piers must reach water of sufficient depth to float vessels when laden, and alongside of which vessels can be brought to be conveniently loaded or unloaded. A sufficient depth of water to float vessels such as navigate the waters of the lake is essential, and

it is a necessary incident of the riparian right that the pier shall penetrate the water to a distance from the shore necessary to reach water which shall float vessels, the largest as well as the smallest, that are engaged in the commerce of the lakes. *Atlee* v. *Packet Company*, 21 Wall. 389, 393; *Langdon* v. *Mayor of New York*, 93 N. Y. 151. . . . We must have regard to the object for which this right is conferred. It is to reach out to accommodate the vessels that plow the waters of the lake. It is in aid of the commerce of the lake, and that right for that purpose should be liberally interpreted and upheld."

After referring to the harbor line adopted by the United States Government at the request of the city of Chicago, the court proceeded : " Without undertaking to say to what extent these proceedings of the city of Chicago were authorized as between it and the people of the State of Illinois, it is sufficient to say that these things have been done without any adverse action on the part of the State of Illinois. If they have no other effect, they tend to strengthen, if support be needed, the general drift of all the evidence in the case, that the necessities of the commercial marine of the Great Lakes require substantially a depth of water of twenty feet to float the larger class of vessels, and indicate that that depth at the present time marks 'the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake.' It is conceded that the piers in question do not intrude into the waters of the lake to that extent, and that the depth of water can be obtained at them only by dredging. Conceding then, as we must, the right of the railroad company to reach that point of practical navigability, these structures were not and are not unlawful, and its rights to them must be sustained. The title to submerged lands resting in the State, are held in trust in aid of navigation. Courts have at all times been diligent to protect and enforce rights of navigation, in aiding and protecting whatever may tend to build up and encourage commerce upon the seas. It does not comport with our sense of duty in the protection of a mere naked legal right to submerged land, to deny a conceded riparian right—conceded because so declared by the ultimate tribunal—when that bare legal title is

held in trust for the very purpose to which these structures are devoted, namely, the accommodation of the commerce of the lake. To compel the abatement or removal of these structures to the extent demanded, or to any extent, in view of the establishment of the harbor line as indicated, would be to render them useless for the accommodation of the commerce of the lakes, and to practically deny to the appellee a substantial and valuable riparian right to which the Supreme Court has determined it is entitled."

The words of our mandate, "*practical* navigability, having reference to the manner in which commerce in vessels [on the lake] is conducted," admonished the Circuit Court that the question as to the extent to which the railroad company could rightfully continue to occupy the bed of the lake with piers, docks or wharves was not to be determined upon narrow, technical grounds, but upon grounds which, under all the circumstances, would be fair and reasonable as between the company and the public, having reference to the manner in which commerce was commonly or habitually conducted in vessels of various sizes.

It is said that in determining whether the piers and docks in question extended into the lake beyond the point of practical navigability, the Circuit Court could only take into view the size and capacity of vessels habitually employed on the lake at the commencement of this litigation or at the date of the original decree in the Circuit Court.

We are of opinion that nothing in our mandate or opinion compelled the Circuit Court to frame its decree upon that theory. That court was directed to ascertain whether the structures complained of extended beyond practical navigability, having reference to the manner in which commerce " *is* conducted on the lake." There was no intention to withhold the power to determine the particular matter reserved for investigation in the light of the situation as it was when that investigation was made. If this court had intended that that investigation should relate to the situation as it was when the litigation commenced, or when the original decree was rendered, it would have so declared. If, having reference to the manner in which commerce

in vessels was conducted at the time of the investigation below, the structures in question did not extend into the lake beyond the point of practical navigability, then the Circuit Court, in the execution of the mandate of this court, properly confirmed the title and possession of the railroad company as established by the original decree.

It appears from the evidence that in 1847 the largest vessel on the lake had capacity sufficient to carry 18,000 bushels of corn; that in 1860 some grain vessels carried as much as 20,000 bushels, having a draft of about twelve or twelve and a half feet. In 1869, some vessels had a draft of thirteen feet. Later, and during the period covered by the investigation, there were vessels on the lake carrying 100,000 bushels of corn, while others carried as much as 160,000 bushels, the latter drawing from sixteen to eighteen feet of water. The proof shows that the tendency for many years prior to the rendition of the decree was to increase the carrying capacity of vessels. That was particularly so in the case of metal steamers, some of which carried as much as 4000 or 5000 tons, while others varied in draft from ten to eighteen feet. There were, at the time of the investigation below, vessels regularly engaged in commerce on the lake whose draft was as much as twenty feet.

It is safe to say that according to the evidence in the cause a wharf or pier in the lake would not have adequately accommodated commerce, as carried on in many vessels on the lake, unless it had reached water not less than from fourteen to eighteen feet deep; and even such a structure could not have been used by the largest vessels on the lake. It was shown by soundings that the structures in question extended no farther into the lake than was necessary to accommodate a great number of vessels of moderate capacity. When the investigation below was entered upon, pursuant to our mandate, the depth of water in the channel of Chicago River over the La Salle and Washington street tunnels was about sixteen feet and eight inches—a greater depth than exists at the outer edge of the piers, docks, and wharves in question, except that at the mouth of the Chicago River, against the ends of some of the company's structures, there is a depth of from eighteen to twenty feet, obtained

by dredging.   The average depth of water at the outer line of the structures in question does not exceed twelve or thirteen feet at the utmost, which is insufficient for the accommodation of a vast amount of commerce carried on in vessels on the lake. An examination of the evidence will disclose this fact beyond all serious controversy.

We are therefore of opinion that there was no error in holding that, in view of the manner in which commerce was conducted on the lake during the period of the investigation below, such structures did not extend into the water beyond the point of practical navigability.   Regard being had to the weight of the proof, the same conclusion would be reached if we looked at the capacity of the vessels used on the lake at the time of the original decree in the Circuit Court.

Confirmation of these views will be found in the testimony of many witnesses whose opinions are entitled to respect.   Captain Marshall of the Engineer Corps of the United States Army, having accurate knowledge of the harbor of Chicago and of its needs, was asked the question : " Having reference to the manner in which commerce in vessels is now conducted on the lakes at the port of Chicago, what, in your opinion, is the reasonable and necessary depth of water in a slip or dock for the accommodation of that commerce ? "   His answer was : " At present no vessel with a deeper draft than about sixteen feet can carry on commerce in the Chicago River, so that I should think that a foot deeper than that, seventeen feet, would be a proper depth to accommodate the largest as well as the smallest vessels that come to Chicago now."   He was also asked : " If you were to construct a pier or wharf in the said outer harbor for the accommodation of vessels engaged in lake commerce, or were to advise in relation thereto, what would be the depth of water you would consider it necessary to reach in order that such pier or dock should be available for the uses intended ? "   He replied : " Seventeen feet at present, and ultimately they should construct their docks with twenty feet of water.   Piling and bulkheads so as to stand dredging to twenty feet."   Many other witnesses testified substantially to the same effect.

It does not follow from what has been said that the railroad company can, of right, further extend into the lake either the structures in question or new structures.   While sustaining the title and possession of the railroad company in respect to piers and docks, *so far as then constructed,* the original decree of 1888 perpetually enjoined the railroad company from erecting structures in or filling with earth or other materials any portion of the bed of Lake Michigan as it then existed and was shown on the Morehouse map east or in front of the fractional sections ten and fifteen, that is, " east or in front of the grounds *now* [at the date of the original decree] occupied and used by it between Chicago River and the north line of Randolph street extended eastwardly, or east or in front of the grounds now [then] occupied and used by it between the north line of Randolph and the centre line of Sixteenth street, each extended eastwardly, except that said company may *complete the slip or basin* already commenced immediately north of Sixteenth street extended, with a wharf on each side not exceeding one hundred feet in width each, where vessels coming into such slip or basin may load or unload, and upon which tracks of the company may be laid."   These restrictions imposed by the original decree were confirmed by the former decree of this court, leaving open only the question whether the structures complained of, and as then constructed and maintained, extended into the lake beyond the point of practical navigability.   So that the railroad company cannot acquire by the present decision any authority to further extend its structures into the lake.   It must stand upon the original decree of the Circuit Court in respect of its rights.

We may add that the Circuit Court and the Circuit Court of Appeals having concurred in finding that the structures in question did not extend into the lake beyond the point of practical navigability—which is largely, if not entirely, a question of fact—the decree should not be disturbed unless it was clearly in conflict with the evidence.   *Compania La Flecha* v. *Brauer,* 168 U. S. 104, 123; *Stuart* v. *Hayden,* 169 U. S. 1, 14; *Baker* v. *Cummings,* 169 U. S. 189, 198; *The Carib Prince,* 170 U. S. 655.

*For the reasons stated the decree of which the State complains must be affirmed and it is so ordered.*

The CHIEF JUSTICE having been of counsel for the city of Chicago in the earliest stages of this litigation,. took no part in the consideration or decision of this case.