## SORENSEN et al. v. PYRATE CORPORATION.*

### No. 6938.

Circuit Court of Appeals, Ninth Circuit.

June 26, 1933.

A. L. Abrahams and Paul Bardsale D'Orr, both of Los Angeles, Cal., for appellants and cross-appellees.

Harold M. Sawyer, Alfred T. Cluff, and Daniel W. Evans, all of Los Angeles, Cal., for appellee and cross-appellant.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

This is the second time that this case has been before this court. Since, in our view, all issues save one were disposed of on the first appeal, reference is here made to the decision of this court on the former presentation. Pyrate Corporation v. Sorensen et al., 44 F.(2d) 323.

The former opinion of this court contained a full statement of the facts, which we summarize hereinbelow, with such omissions and additions as are rendered desirable by the situation on the present appeal:

The appellee and cross-appellant, a corporation having its principal place of business at Portland, Or., and hereinafter referred to as the plaintiff, entered into a contract with the appellants and cross-appellees, hereinafter to be designated as the defendants Sorensen and Dee, who are both residents of Los Angeles, Cal. Under the contract, the defendants were given the exclusive right to sell "a cleansing product known as and sold under the registered trade name of 'Pyrate,' both in bulk and package form."

The contract is dated July 10, 1925, and was to continue for a period of twelve months from that date, with the privilege of renewal for a further period of four years, and, at the expiration of the second period, for an additional five-year period.

The agreement between the parties may be briefly summarized as follows:

The contract recites that the plaintiff is the exclusive owner of all varieties of Pyrate;

*Rehearing denied September 6, 1933.

that the defendants desire to act as exclusive agents for the marketing of the product in California, and, in consideration of being granted that right "and other advantages," agree "that they will purchase during every twelve months' continuation of the within contract, a minimum quantity of 800,000 pounds of the" product. The contract fixed the price per pound of the commodity, but provided for a change in cost in accordance with the fluctuations of the market. The plaintiff was to furnish to the defendants formulas of the special mixtures supplied to them, provided that such formulas should remain the property of the plaintiff, and that "upon the cancellation of the within contract by either party the buyers agree to deliver to the seller, on demand, all records of sales of bulk Pyrate and/or special mixtures." These records and formulas are not in controversy here.

The contract also provided that "buyers will not at any time engage in a similar or competing business, or make use of formulas or information furnished them under the terms of the within contract, to further the interests of any similar or competing business," and that the "buyers will conduct their business during the life of this contract under the name of 'Pyrate Products of California.'"

Finally, the agreement set forth that the plaintiff would not be held responsible by the defendants for delays in shipment not due to the former's neglect, or for failure to supply Pyrate because of any cause over which the plaintiff had no control.

While the contract was dated July 10, 1925, it was not actually signed until September 8, 1925. In that interval, some pertinent correspondence took place between the parties.

On July 31, 1925, the defendant Dee wrote to the plaintiff suggesting that "one-fourth of the stipulated quantity be used as a basis in writing the contract for our mutual benefit." On August 4, 1925, the plaintiff, in a letter to the defendant Dee, wrote as follows: "In regard to contract, we are returning it herewith, and ask that you sign it for the specified quantity, i. e., 800,000 lb., however, you may take this letter as authority for a distinct understanding that we will not call upon you to accept more than 200,000 lb. under terms of the contract, unless you so desire. This with the agreement that yourself and Mr. Sorensen give it your undivided attention."

The business of selling "Pyrate" was continued by the defendants, acting under the name of the Pyrate Products Company of California, until September 9, 1927, when the defendants by letter notified the plaintiff that, "on and after October the 15th, we will no longer continue as your distributor." The reason given was the plaintiff's alleged "angling for a deal to sell out the Pyrate Corporation to the Oakley Chemical Company," which the defendants asserted they "construed in the light of a breach of faith."

In the first proceedings, the court below held that the contract had not been expressly renewed at the expiration of the first twelve-month period, and that such express renewal was necessary "to work a renewal of the contract for the additional four years."

Accordingly, the court awarded the plaintiff damages of only $500, for the defendants' failure to deliver to the plaintiff certain sales records, issued an injunction restraining the defendants doing certain acts in connection with "Pyrate," not involved in the present controversy, and awarded the plaintiff its costs. The District Court, however, ignored the plaintiff's prayer for an accounting and damages, in connection with the defendants' sale of "Turco," a product similar to that of the plaintiff, since September 9, 1927. The plaintiff appealed from the decree of the District Court.

When the case was presented on the first appeal, this court said:

"This proviso of the contract with reference to renewal is the only question involved on the appeal; plaintiff contending that the contract had been renewed and that the defendant broke the contract by refusal to continue thereunder. * * *

"In view of all the circumstances, and particularly in view of the fact that the parties both treated the contract as still in effect after the date fixed for its expiration unless extended, we must hold that the plaintiff accepted the conduct of the defendant as sufficient to exercise its option and that both are bound thereby. * * *

"The views which we have expressed will necessitate a reversal of the judgment in so far as it denies to the plaintiff such damages as they may have suffered by reason of the breach of the contract by the defendants. Plaintiff has offered evidence tending to show the amount of profits they would derive from the continuance of the contract. * * * The parties have not attempted on this appeal to present a record sufficient for us to determine therefrom the amount of damages, nor to adequately instruct the trial court upon that subject upon a rehearing of that ques-

984

tion. Both appellant and appellees seem to contemplate that in the event this court holds that the contract between the parties was extended for four years, * * * the question of damages is a matter for determination by the trial court. We refrain from expressing any further views with regard to the amount or measure of damages.

"Decree is reversed, and the action remanded to the trial court for further proceedings not inconsistent herewith."

The cause was referred to a special master for "findings of fact and recommendations as to a decree in respect to the nature and amount of the damages, if any, suffered by the plaintiff as a result of the abandonment by the defendants L. C. Sorensen and M. J. Dee of the performance on their part of the terms of the contract between the parties dated July 10, 1925." The reference, described as being "general," was dated March 16, 1931.

On May 11, 1931, the plaintiff filed a supplemental complaint, containing only one count, which dealt solely with the question of the amount of damages, asserted to be $50,000.

On May 12, 1931, more than three and a half years after the plaintiff had filed its original complaint, the defendants filed a pleading denominated "answer to supplemental complaint," but in reality setting up a separate defense in no way related to any new matter contained in the supplemental complaint, which, as we have said, was confined strictly to the question of the amount of damages. This defense related to alleged "false and fraudulent representations" by the plaintiff that "the cleansing product known and sold under the registered trade name of 'Pyrate' was a secret combination of raw materials originated and owned by plaintiff," etc.

The report of the special master at the second trial sets forth that under their answer to the plaintiff's supplemental complaint, the defendants offered evidence of fraud at the inception of the contract. The master's report continues: "Upon the master's refusal to accept such evidence, the defendants demanded that the master certify to the court the question raised by the offer. Upon this demand a certification was made. The cause was returned to the master with instructions to proceed upon the pleadings as. they stood at the time of the order of reference. The master is of the opinion that no matter was at issue at that time except the amount of the damages. The proceedings heretofore have determined that the contract in issue was val-

id and had been breached. The previous findings as to the terms and nature of the contract have been considered in so far as they affect the issues raised on the accounting."

The defendants filed three exceptions to the master's report as to the issue of fraud. The court overruled all exceptions to the master's report, filed by either party, and the overruling of the exceptions as to fraud is made by the defendants the basis of three special assignments of error.

The lower court then entered a "final decree after reference," awarding the plaintiff damages, as suggested by the master, on the basis of the 200,000-pound yearly minimum.

Nowhere in the record or in the briefs do we find any explanation why the defense of fraud was not urged at the first trial. If fraud there was, the defendants must have discovered it at some time before they breached the contract, and not afterward; for Sorensen, one of the defendants, testifying at the second trial, said: "They told us they had a material on which they had protection, that no one else could buy it, so we were really misled in the beginning, although later when we saw bills of lading and they stated 'trisodium phosphate', we realized we were getting just the regular grade of trisodium phosphate."

Indeed, the defendants assert in their belated defense that they "discovered the falsity of the said representations" "shortly before September 9th, 1927." Yet in their original answer, filed November 7, 1927, there is no accusation of fraud against the plaintiff.

Aside from the defendants' pleadings, however, the entire record shows that the defendants could have discovered any fraud, if fraud there was, long prior to the date on which they breached the contract.

Without laboring this point further, we hold that the language of this court, in its opinion in the former appeal, conclusively establishes that it regarded the original contract as valid. Indeed, in the earlier proceedings, the defendants themselves so regarded it; for, in their original answer, they "allege that said agreement terminated on July 10th, 1926."

The defendants are precluded by the "law of the case" now to attack the validity of the contract, on any of the three grounds set up in their briefs; namely, deceit, nonexistence of subject-matter, and lack of mutuality. If these defenses had any basis in fact, they *might have* and *should have* been urged at the first trial; or, at the latest, on the first appeal.

They cannot now be presented. Firmly established in jurisprudence, the doctrine of the law of the case is grounded upon sound principles of public policy. The proper administration of justice demands that there be an end to litigation. It demands that parties shall not present their causes of action or their defenses piecemeal.

The doctrine has been repeatedly recognized by the Supreme Court. As early as the leading case of Roberts v. Cooper, 20 How. (61 U. S.) 467, 481, 15 L. Ed. 969, the court said: "It has been settled by the decisions of this court, that after a case has been brought here and decided, and a mandate issued to the court below, if a second writ of error is sued out, it brings up for revision nothing but the proceedings subsequent to the mandate. None of the questions which were before the court on the first writ of error can be reheard or examined upon the second. To allow a second writ of error or appeal to a court of last resort on the same questions which were open to dispute on the first, would lead to endless litigation. In chancery, a bill of review is sometimes allowed on petition to the court; but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate on chances from changes in its members. [Many cases cited.]"

The full implications of the rule were thus elaborated in Cromwell v. County of Sac, 94 U. S. 351, 352, 353, 24 L. Ed. 195: "In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, *but as to any other admissible matter which might have been offered for that purpose.* Thus, for example, a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and the amount due upon it, although it be subsequently alleged that perfect defences actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defences were not presented in the action, and established by competent evidence, the subsequent allegation of their existence is of no legal consequence. The judgment is as conclusive, so far as future proceedings at law are concerned, as though the defences never existed. The language, therefore, which is so often used, that a judgment estops not only as to every ground of

recovery or defence actually presented in the action, but also as to every ground which might have been presented, is strictly accurate, when applied to the demand or claim in controversy. Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever." (Italics our own.)

That the foregoing observations were intended to be applicable to prior judgments on appeal—and, generally speaking, even to reversals—may be seen from the opening language of Mr. Justice Brewer's opinion in United States Trust Co. v. New Mexico, 183 U. S. 535, 539, 540, 22 S. Ct. 172, 174, 46 L. Ed. 315: "The district court dismissed the intervening petition on the ground that it presented no claim against the property or the parties. The reversal by this court of such order is an adjudication that upon the face of the petition a valid claim was presented, and is conclusive of such prima facie validity, not merely against objections which were in fact made, but also against those which might have been made. [The Cromwell Case, supra, cited.]"

See also, In re Sanford Fork & Tool Co., 160 U. S. 247, 255, 256, 16 S. Ct. 291, 40 L. Ed. 414; Illinois v. Illinois Central Railroad Co., 184 U. S. 77, 91–93, 22 S. Ct. 300, 46 L. Ed. 440; Caledonian Ins. Co. v. Levy (C. C. A. 9) 233 F. 92, certiorari denied 242 U. S. 636, 37 S. Ct. 19, 61 L. Ed. 539 (a case involving the effect of a prior reversal); Burns v. Cooper (C. C. A. 8) 153 F. 148, 151, 152.

There is nothing in the language in Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 553, 554, 24 S. Ct. 538, 48 L. Ed. 788, or in E. E. Taenzer & Co. v. Chicago, R. I. & P. R. Co. (C. C. A. 6) 191 F. 543, 547, 548, which weakens the application of the principle of the law of the case to a situation where, as here, there is a reversal on the first appeal for a limited purpose; i. e., that the trial court should proceed to assess damages for the breach of contract as adjudicated. No retrial was ordered on any other issue; therefore the reasoning in the Mutual Life Ins. Co. Case, supra, would not apply.

■ We turn, finally, to the question of the measure of damages. The plaintiff insists that neither the 200,000 pound nor the 800,000 pound minimum should apply, but that the measure should be the loss sustained by the plaintiff by the failure of the defendants to purchase material from the plaintiff "to the extent of their business requirements, and the plaintiff's damages for the breach were its

loss of profits on such prospective sales." Under the pleadings and evidence of this case, however, we are not prepared to sustain the plaintiff's contention in this regard.

On the other hand, we hold that the minimum of 200,000 pounds, contended for by the defendants—in the event any damages at all are assessed against them—is not the proper one to govern in this case. That minimum, it will be recalled, was set "with the agreement that" the defendants should give the performance of the contract their "undivided attention." Since, after the breach of the contract, the defendants not only failed to give their undivided attention to the plaintiff's business, but gave no attention at all, and sold more than 800,000 pounds a year of their own "Turco" product in competition with the plaintiff, it is clear that the yearly minimum of 800,000 pounds should apply.

In his report, the master stated that the plaintiff's damages, if computed on the basis of an 800,000-pound yearly minimum, would amount to $26,026.

Accordingly, the judgment of the lower court is reversed, and the case is remanded, with instructions that the District Court enter a judgment in favor of the plaintiff for $26,526.00, including the $500 item not appealed from, with interest on the basis adopted by the lower court.

Reversed and remanded, with instructions.