(59 South. 721.)

No. 18,748.

PONS v. YAZOO & M. V. R. CO. et al.

(June 15, 1911. On Rehearing, June 29, 1912.)

(Syllabus by the Court.)

1. FORECLOSURE OF MORTGAGE—PAYMENT OF NOTES.

The promissory note secured by mortgage, on which plaintiff in foreclosure proceeded, had been paid.

2. MORTGAGES (§ 534*)—FORECLOSURE—RIGHT TO FORECLOSE—PAYMENT OF DEBT.

No title could be conveyed to an adjudicatee on a mortgage note that had been paid.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1555; Dec. Dig. § 534.*]

3. FORECLOSURE OF MORTGAGE—NOTES OMITTED.

Plaintiff in foreclosure held two other notes, upon which he did not choose to declare in the foreclosure proceedings.

4. FORECLOSURE OF MORTGAGE—THEORIES OF PARTIES.

The theory of the defense is that the Bank of Commerce, among whose papers the mortgage note of $8,750, was found, held it legally and other two notes, while the theory of the plaintiff is that the Bank of Commerce only held the last two notes.

5. MORTGAGES (§ 587*)—FORECLOSURE—SALE—RIGHTS OF PURCHASERS.

This court has already decided that the title of a third possessor cannot be divested by sale under executory process, issued on a mortgage note which had previously been paid. Pons v. Yazoo & Mississippi Valley R. R., 122 La. 158, 47 South. 449.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1685, 1685½, 1687, 1688; Dec. Dig. § 587.*]

6. CASE REMANDED.

The case was remanded for trial on the merits.

7. MORTGAGES (§ 319*)—FORECLOSURE—PROCEEDINGS TO SET ASIDE—SUFFICIENCY OF EVIDENCE.

The preponderance of testimony proved that the note had been paid.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 855–863, 875, 913, 1356, 1366; Dec. Dig. § 319.*]

8. MORTGAGES (§ 534*)—FORECLOSURE—RIGHT TO FORECLOSE—PAYMENT OF DEBT.

The adjudicatee acquired no title.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1555; Dec. Dig. § 534.*]

9. EQUITY (§ 87*)—ESTOPPEL (§ 98*)—EQUITABLE ESTOPPEL—PERSONS AFFECTED—HUSBAND AND WIFE—LACHES.

The acts of omission or of commission which estopped the husband, who is not the agent, did not estop the wife; nor is she concluded by his laches. She was a third possessor, and the property did not pass from her to the defendant by the illegal adjudication.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242–244; Dec. Dig. § 87;* Estoppel, Cent. Dig. § 290; Dec. Dig. § 98.*]

10. MORTGAGES (§ 539*)—FORECLOSURE—PROCEEDINGS TO SET ASIDE—RELIEF GRANTED.

The mortgage claim on the two notes of $15,000 revives and is reinstated. The value of the property at the time that the railroad went into possession of it for its use as a railroad to be deducted from the revived indebtedness as of the date that the sale of this property is proven.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1560; Dec. Dig. § 539.*]

11. MORTGAGES (§ 587*)—FORECLOSURE—PROCEEDINGS TO SET ASIDE—RELIEF GRANTED.

Plaintiff owned the property for which she brought suit, subject to the rights which inured to the railroad.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1685, 1685½, 1687, 1688; Dec. Dig. § 587.*]

12. MORTGAGES (§ 539*)—FORECLOSURE—SETTING ASIDE FORECLOSURE—IMPROVEMENTS.

To the railroad was reserved the right of suing for improvements on the land in its possession not in use for railroad purposes.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1560; Dec. Dig. § 539.*]

13. MORTGAGES (§ 548*)—FORECLOSURE—SETTING ASIDE FORECLOSURE—IMPROVEMENTS.

To the plaintiff is reserved the right, if any she has, to sue for rental from the date that suit was filed.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1566; Dec. Dig. § 548.*]

*(Additional Syllabus by Editorial Staff.)*

14. MORTGAGES (§ 440*)—FORECLOSURE—NOTICE TO OWNER.

Where the deed upon which a foreclosure was made contained the pact de non alienando, the proceedings are conducted contradictorily with the original debtor, and there is no necessity of notifying a subsequent purchaser from the mortgagor.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1298, 1299, 1303–1307; Dec. Dig. § 440.*]

15. BILLS AND NOTES (§ 440*)—VALIDITY—REISSUE.

Matured paper cannot be reissued by the maker after payment.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1223–1232, 1260, 1261, 1304–1488, 1490, 1491; Dec. Dig. § 440.*]

On Rehearing.

16. SUBROGATION (§ 23*) — GROUNDS — ADVANCES FOR DISCHARGE OF INCUMBRANCE.

Where a debtor applies to a bank for a loan with which to take up a mortgage indebtedness, and the loan is made upon his executing a mortgage for the amount required and existing indebtedness to the bank, and he takes the proceeds and pays the mortgage, the bank is not subrogated to the rights of the mortgagee.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 60–66; Dec. Dig. § 23.*]

17. SUBROGATION (§ 23*)—ADVANCES FOR DISCHARGE OF INCUMBRANCE.

A bank which was a creditor of a partnership could not, by payment of a debt of one of the partners, become subrogated to the claim of the creditor.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 60–66; Dec. Dig. § 23.*]

Provosty, J., dissenting.

Appeal from Twenty-Eighth Judicial District Court, Parish of Jefferson; Prentice E. Edrington, Judge.

Action by Mrs. Carmelite Pons, wife of George A. Louque, against the Yazoo & Mississippi Valley Railroad Company and others. From a judgment for defendants, plaintiff appeals. Modified.

See, also, 122 La. 156, 47 South. 449.

Lazarus, Michel & Lazarus, Farrar, Jonas, Goldsborough & Goldberg, and David Sessler, for appellant. Hunter C. Leake, Gustave Lemle, L. H. Marrero, Jr., Eugene D. Saunders, Newton C. Blanchard, Blewett Lee, and C. L. Sivley (Chas. N. Burch, of counsel), for appellees.

BREAUX, C. J. The action was petitory.

Plaintiff asked to be decreed the owner of lands situated in the parish of Jefferson.

It was formerly the Lafreniere plantation, owned by plaintiff's husband, George A. Louque.

Plaintiff is separate in property from her husband.

Plaintiff's husband was indebted to her in large amount, which amount was secured by mortgage.

He transferred this plantation to her on July 2, 1897, in part satisfaction of his indebtedness.

An exception was filed in the district court by defendant on a number of grounds. We will not state these grounds, as they are stated in the decision referred to infra.

The exception was sustained, and the cause dismissed.

On appeal, the exception was maintained, the cause was reinstated by this court, and remanded for trial on the merits. See same title, 122 La. 156, 47 South. 449.

After it had been remanded to the district court to be tried on the merits, it was tried and decided in favor of defendant.

Plaintiff appealed.

Some of the points presented here, if sustained by the facts of record (as we think they are), were decided in the first appeal.

Some time prior to the date that plaintiff became the owner of this property, there was a note due by the owner of the place, George A. Louque, the husband, secured by special mortgage and vendor's privilege on it, for $8,750.

It had been past due for some time.

The owners, Milliken & Farwell, were pressing George A. Louque, the maker of this note, for payment.

He made several unsuccessful attempts to borrow the amount wherewith to pay this sum. He called on several banks and money brokers, all in vain.

Finally, he called on the president of the Bank of Commerce of this city, with whom he had had financial dealings, and to whom he was indebted for about $4,000 at the time, for which there was an overdraft in the bank just named.

The president heard his statement about his inability to borrow a much needed sum at that particular time.

The president suggested to him to make two notes, one for $5,000 and the other for $10,000, secured by mortgage on the Lafreniere plantation, which was Louque's property at the time, and that by depositing these two notes as security it would be possible for him to raise the money with his bank.

This suggestion was followed.

There was a mortgage given for the amount, and the wife of George A. Louque renounced her paraphernal rights in favor of the mortgagee.

He thereby obtained the amount to satisfy the note, $8,750, and to cover the overdraft of $4,000 at the bank.

The position of plaintiff at this point is that the note was absolutely paid by her husband, and that she therefore cannot be held responsible.

This is one of the important points which has given rise to extended argument at bar.

Regarding the payment vel non of this note, witnesses were examined at some length.

It may as well be said here that both plaintiff and defendant derive title from a common author.

Plaintiff by a dation en paiement made by her husband to her on July 2, 1897, and the defendant by being adjudicatee of the property in foreclosure proceedings of the $8,750 note in August, 1898.

Defendant held two notes, amounting to $15,000, and the $8,750 note, secured by vendor's mortgage.

Defendant did not use the first two, but chose to foreclose on the $8,750 note, which plaintiff avers has been paid.

One of the grounds of plaintiff in regard to this foreclosure sale is that she was never notified at all and had no knowledge of the proceedings.

The Bank of Commerce, holder of these three notes, failed, and was placed in the hands of liquidators, and after its failure the notes were transferred to Mr. H. C. Leake.

We will here state that this note for $8,750 remained with the bank until it was pledged to the New Orleans Clearing House Association.

When the Clearing House Association was settled with by the liquidators of the bank, it was returned to the bank, where it remained until about a year after the liquidators had been in charge.

The amount borrowed from the Clearing House Association (that was before the

bank's failure), for which this note was security in part, amounted to $60,000, secured by collaterals.

The bank, in a moment of great financial emergency, in order to pass the financial storm, gathered a number of its notes, among them the note for $8,750, and deposited them as security for the $60,000 loaned by the Clearing House Association.

After payment of the $60,000 indebtedness of the bank, as before stated, made to the Clearing House Association, and the values had been returned to the liquidators, the liquidators, in time, in accordance with an order of court, sold this note as one of the assets of the bank to Mr. Leake.

They also sold to Mr. Leake the two notes, one for $5,000 and the other for $10,000, before mentioned, all for $15,000.

[4] Plaintiff's contention is that the defendant acquired no title, because the note of $8,750, before referred to, had been paid, and therefore the foreclosure proceedings were null and void; that her own title remains in full force and effect; that she is entitled to possession, and that defendant is in bad faith; and she asks for reservation of certain rights to be claimed in a separate suit.

The defense is that the note in question was not paid; that it was taken up by the Bank of Commerce, some time before its failure, for its own account, and became one of its assets; that after the failure of the bank it was validly sold in accordance with an order of court; and that after it had been bought by Leake the proceedings he instituted on this note in foreclosure were regular.

The defense further is that plaintiff's laches estops her from claiming the property; that, even if originally Leake did not have an absolute right to this particular note, the property in this foreclosure passed, free of all claims, from her to the defendant railroad, and that it is now part of its great railroad system, and, as such, indispensable; that, the lands having been in use for nearly nine years, the properties cannot now be taken from defendant; and that at most, if plaintiff can recover anything, she can recover only the value of the land when taken subject to the first mortgage.

In the alternative, defendant pleads its good faith, and urges that it is entitled to recover, before it can be evicted, the value of its improvements on the land, amounting to a very large sum.

In the foreclosure proceedings before mentioned, defendant bought the property (Lafreniere plantation), for $15,000.

We will return, for a moment at this point, to give further consideration to certain facts preceding the failure of the bank, and to say that some one, when the emergency referred to above arose, must have considered the note used in foreclosure as an asset of the bank.

Whatever was done in that emergency cannot bind the plaintiff, if, as we think, the note had been paid.

It is quite certain, that after the failure the liquidators of the bank and their attorneys, in good faith, considered it as an asset of the bank.

As such, it was sold.

In justification of the sale of the note, the principal attorney for the liquidators, in a letter addressed to Mr. Leake, says that the Bank of Commerce bought the $8,750 note in due course of business from Milliken & Farwell, at the same time that the two notes, one for $5,000 and the other for $10,000, were placed in the hands of the bank as collateral security.

While entertaining the highest respect for the opinion of that attorney, we must say that his opinion is not sustained by the weight of the testimony of the officers of the bank.

The distinguished attorney by whom this letter was written, whose sincerity and good faith are not for a moment questioned, did not have all the details before him, as he himself admits; but he insists that he must have had reason for making the statement.

Of this we have not the least doubt.

A short time prior to the adjudication to defendant in July, 1908, George A. Louque, maker of the $8,750 note, wrote to the president of the Illinois Central Railroad, saying that the liquidators of the Bank of Commerce held three notes against Lafreniere plantation, one note secured by vendor's lien and the other notes by a mortgage.

It must be borne in mind that this is the statement of the husband, with which the plaintiff had naught to do.

Plaintiff testified that she knew nothing of this sale of the plantation under executory process until January, 1899.

It must be said that George A. Louque never claimed this $8,750 note at any time; and that, in so far as he is concerned, he is absolutely concluded and estopped.

The evidence shows that it was different as relates to plaintiff. She is not bound by acts and utterances of her husband.

But to take up the question of fact relating to the payment of this note.

[7] We have grouped certain facts as follows:

The first evidence that attracted our attention was that of Mr. Farwell, representing the firm of Farwell & Milliken, holders of the note, amounting at the date that Farwell & Milliken received payment to the sum of $10,899.58.

Farwell in testifying always refers to this last note—i. e., the note of $8,750—as one which was paid to his firm by the maker of the note, George A. Louque.

He seems to have known no one else as liable in the matter, either directly or indirectly.

131 LA.—11

He states particularly that the note was taken out of his possession by a personal check of George A. Louque, certified to by the Bank of Commerce. But, when asked if the note was transferred to the bank by the firm, or if it was a payment, his answer was that he did not know. Despite this answer at the close of his testimony, the testimony taken as a whole creates a decided impression that the witness thought that the certified check was delivered to him in payment of the note.

His explanation at this point, with reference to his custom in matter of notes, was that whenever he held several notes for collection he invariably marked them "Paid," except if it was the last of several; then he did not care what became of it.

The object of marking all save the last note as paid is evident, and needs no comment, except to say that, all prior notes having been paid, it made no difference how often it might be issued.

The evidence informs us that the president of the Bank of Commerce called on Farwell with Louque to ascertain the amount of the principal and interest due on the note. And that on another day George A. Louque returned and delivered the personal check, before mentioned, and took the note.

The cashier of the Bank of Commerce testified that with the two notes, one for $5,000 and the other for $10,000, secured by mortgage on Lafreniere plantation, and another note of $1,000, which the bank held as security, the bank was absolutely secured for all indebtedness of George A. Louque and W. N. Louque, to whose account the personal indebtedness of George A. Louque had been transferred some time prior on the books of the bank; that these notes were amply sufficient to cover both the amount of the overdraft, due by George A. Louque to the bank, and the $8,750 note; that George A. Louque took up the vendor's privilege note; that the

certified check, above mentioned, was charged to George A. Louque's individual account; that he placed the two mortgage notes, one for $5,000 and the other for $10,-000, in the bank's portfolio; that as to the note of $8,750, he placed it on a clip that he had for that purpose; that he (the cashier) kept it in order to have the mortgage canceled, but, as this claim did not bother the bank's officers further, they simply held the note, knowing that it was paid; that they were quite well aware that there was nothing due on the plantation, except the $15,-000 mortgage notes held by the bank; that the bank had no title whatever to this note.

We will take up for a moment the testimony of the president of the Bank of Commerce.

As relates to the note in question, he, as a witness, said that it was left with the bank to secure the indebtedness of George A. and W. N. Louque, and that J. B. De Blanc, cashier of the bank, negotiated the loan of September 9th and 10th, of $60,000, with the New Orleans Clearing House Association, and that the note in question, together with other notes, were pledged as collateral with the Clearing House Association.

That, prior to that time, while it was still held by Milliken & Farwell, it was taken up with Milliken & Farwell by George A. Louque with a personal certified check, and that the funds were the funds of the Bank of Commerce; that the check was charged by the bank to the account of George A. Louque, thereby making an overdraft.

The president testified that he presumed that the liquidators furnished the notary and appraisers information, in order to enable them to appraise the funds of the bank. To this mere presumption, no great weight can be given, because it is devoid of certainty in statement, which amounts only to an impression.

He presumed this because he had very little to do with that himself, he added.

In the inventory, made about the time the liquidators were appointed, the following appears:

George A. Louque and W. N. Louque, secured by note of mortgage on property in the parish of Jefferson, dated Jan. 2, 1890, amounting to fifteen-thousand dollars.............$11,279.49

And again, under the same heading, on page 55 of the inventory:

George A. Louque and W. N. Louque, secured by same collateral as set forth above. .$5,095.91

This is all there is upon the subject; it is not conclusive either way, for or against any of the parties.

The president said that he had no recollection of the exact figures of these overdrafts, but considered the vendor's lien and mortgage note of $8,750 and the note for $15,-000 were left as security to cover the entire indebtedness of Mrs. Louque, and that the mortgage notes and vendor's notes should have been kept together as one transaction.

But, on cross-examination, the president explains in the following words:

"As I said before, the note was taken up by Mr. Louque with his personal check, or the check of George A. Louque and W. N. Louque; and the note was held in the portfolio of the bank to secure the indebtedness incurred by the payment of the check, and pending the sale of the $15,000 mortgage notes, which were to reimburse the bank for this payment and other indebtedness."

That the mortgage notes for $15,000 (that is, one for $5,000 and the other for $10,000) he was under the impression were left with the cashier after the taking of the vendor's lien note, and, as he considered the $15,000 notes had not been negotiated yet, the whole was held as collateral against the indebtedness.

Again, he states the loan from the Clearing House was made by the cashier of the bank.

"I know nothing of the details, but knew of the loan and approved it. I have no recollection

of any item that entered into the loan. I have no recollection at all of the note of George A. Louque for $8,750, pledged to the Clearing House. In fact, I do not recollect any of the collateral pledged."

The manager of the Clearing House Association, Mr. Herndon, testified that in September, 1896, during the financial panic that year, the Bank of Commerce applied to the Clearing House Association for assistance, pledging various collaterals; that he found from the records the total of the securities tendered and accepted; that he found a notation showing a note, alleged to be signed by George A. Louque, for $10,899.58.

If this be correct, it follows that George A. Louque must have deposited a personal note with the bank for the amount, before mentioned, which the bank afterwards deposited with the Clearing House Association.

Mr. Farwell stated as a witness the total due him, which George A. Louque took up, was $10,899.58, the same amount to a cent as the amount of the personal check of George A. Louque.

This note, we have said, was deposited with the Clearing House Association by the bank, and the only inference is that it was his personal note.

If this be in accordance with the facts, George A. Louque furnished a demand note to the bank for the amount. It may be that the bank in turn deposited it, together with the note of $8,750, with the Clearing House Association.

It would then show that he (Louque) was treating personally with the bank in regard to an amount loaned by the bank on the $15,000 mortgage notes as security.

It does not appear that this demand note was ever returned by the Clearing House Association.

Among the great number of papers, this worthless paper disappeared.

Be that as it may, we take up the testimony of the bookkeeper of the Bank of Commerce at the time, who is now the assistant cashier of the Bank of Franklinton, in the parish of Washington.

He testified that the president remarked to him, about the date the loan was made, that he intended to pay a mortgage which was held on Lafreniere plantation, and to let George A. and W. N. Louque have as a loan the sum of $15,000. First, that he would pay the note due Milliken & Farwell, secured by vendor's lien; that in taking up this note and the overdraft of George A. Louque and W. N. Louque he would obtain a first mortgage on Lafreniere plantation for $15,000, which would cover the overdraft, including a sum previously due by the Louques to the bank, for at that time the account of George A. and W. N. Louque was overdrawn for four or five thousand dollars.

According to this witness in the transaction, the personal check of George A. Louque was made payable to Milliken & Farwell for the vendor's lien and mortgage note of $8,750, plus interest, and this check was charged to George A. Louque's individual account; and that the $8,750 note never figured on the books of the Bank of Commerce as an asset of the bank, neither in the ledgers nor in any of the books.

That the Louques owed the Bank of Commerce between $15,000 and $16,000.

This witness swore that the bank had, in addition to the $15,000 mortgage notes, other securities, amounting to $1,000, making a total of $16,000 to secure $15,000.

This witness insists that he was told by the president that he wanted the security for the overdraft of a date anterior.

With reference to the purpose for which the $15,000 notes (one for $5,000 and the other for $10,000) were executed, we will here state: That, in order to complete the transaction, it became necessary for the wife of George A. Louque (who is plaintiff here) to renounce her right as mortgagee

on the place; for at that time she was not the owner. She became the owner afterward.

The wife testified, and in this there is some corroboration, that she only consented to renounce her mortgage on Lafreniere plantation when it became well understood that part of the $15,000 which her husband was borrowing would be used in paying the $8,-750 vendor's mortgage, which primed her mortgage.

We will have occasion to refer to her testimony later again.

Henry Daspit, an expert accountant of long experience, who served in that capacity under the liquidators of the bank, testified that he assisted in making the inventory before mentioned. He went into details in regard to it, and referred to the $60,000 mentioned above, due by the Bank of Commerce to the Clearing House Association, and to the fact that the $8,750 note was held in pledge, and that it was handed to the liquidators by the Clearing House Association after they had taken charge, and after the Clearing House Association had collected its claim due by the bank in liquidation.

He goes over the ground again, and states that George A. Louque and W. N. Louque, secured by mortgage notes on property in the parish of Jefferson one amount for $11,-279.40, and another amount of $5,095.71; that those two amounts appeared on the books of the bank, as against which there was found in the portfolio of the bank two notes, one for $5,000 and the other for $10,-000, held by it as collateral security, and which were so entered upon the books of the liquidators and used by them in the settlement of overdrafts.

That the note for $8,750 was not held as collateral by the bank; it was not in the portfolio. No entry showed that it was ever considered as an asset of the bank.

The witness Daspit adds that his knowledge did not come from any of the officers of the bank nor from Mr. Leake, but entirely from the entries which he found in the books of the bank.

The paying teller of the bank, Schumaker, testified that he delivered the certified check, before mentioned, to George A. Louque.

In the afternoon of the day it was delivered to him, he returned to the bank, showed the $8,750 note to the paying teller, and said to him that he had paid his last mortgage note.

That George A. Louque, the debtor, received a certified check from the bank, made in his favor, to the order of Farwell, or Farwell & Milliken, took it to the former, and the former handed him the note when he received the debtor's check, in payment of the note, evidently, this creditor understood.

This witness also testified that the books of the bank were destroyed, by order of the court, after the liquidation had been closed, all except the dividend book.

He sought to verify certain facts by reference to entries in the books some time previous, but had not succeeded.

He knew, however, of the indebtedness at the time of George A. Louque to the bank, and that, prior to the large transaction herein involved, the husband of plaintiff had no credit in the bank. He at the time expressed some surprise that one whose credit had been so limited had obtained a check for so large an amount, as before stated.

We can only here add that evidently the bank must have furnished him (Louque) with a check to pay this note. Had the bank intended to take up the note, it would have issued its own check, and would have taken it for its own account. It would not have permitted the maker of the note to pay it, as he did, with his own certified check.

The silence of the officers of the bank, who testified as to the payment of the note,

is alluded to as inconsistent. This may be explained by the fact it does not appear that their attention was called during the liquidation to the status of this note. There is evidence proving that the books were in a chaotic condition, and the values that the bank had in a complete state of confusion.

It is made evident by the record that there was confusion in the business of the bank during the financial panic which swept it out of existence, as well as destroyed other financial institutions. In the financial troubles, it may well be that papers were mingled which should have been kept separate and distinct.

This is not said with a view of finding fault with any one. The bank affairs are of the past. Our only purpose is to give an idea of the condition.

It does not appear to us that any one was prompted by a desire of representing the facts otherwise than as they were.

The settlement of the business of the bank, which followed its failure, has, to a certain extent, been brought under the limelight.

As to the liquidators and their assistants, we have found that upon inquiry they were informed that the parties, George A. and W. N. Louque, had been customers of the bank. They arrived at the conclusion that the note of $8,750 was an asset of the bank.

In this they acted with the utmost good faith. They were actuated by the best motives, also, in the sale of the notes of $15,000, including the $8,750 note, which was made under an order of court about one year after the opening of the bank's liquidation.

It did not devolve upon them to institute judicial inquiry in this respect.

There was no negligence on their part. Doubtless there were a good many papers of different kinds—good, bad, and indifferent.

What was done might have been done by the most vigilant and judicious.

The note was transferred in regular course (but after maturity), under circumstances which leaves no room for blame.

### Foreclosure Proceedings.

They were regular and in due form.

In the proceedings themselves, or in the act of those who subsequently became interested, nothing suggests that there was an attempt at circumventing any one.

It was an open, public sale, made at the instance of the holder of the note.

The adjudicatees desired to become the owners of the property; their bid was accepted, and they were declared the owners.

[14] As relates to the foreclosure proceedings, there is no necessity of referring further than heretofore to the facts than to state that the deed upon which the foreclosure was made contained the pact de non alienando. This being the case, the proceedings were conducted contradictorily with the original debtor, and there was no necessity in law of notifying the plaintiff, although at the date of the sale the property was in her name.

A concession, as we understand, was made with the debtor, George A. Louque, by the owner of the note, under which the sale was made, whereby the rental for the plantation for the year was allowed to the former.

This did not affect the plaintiff's interest, as she was not a party.

Legally, in so far as relates to the holder of the note, there is nothing to criticise or to object to in this.

Mrs. Louque, as a witness, from the first denied that her husband was her agent, and she denied that she knew of the different transactions regarding the plantation and the disposition attempted to be made of her interest.

We refer to the facts in groups, as they present themselves in considering the issues.

Having considered nearly all of the facts to which it is necessary to refer in matter of the bank and its failure, we come to the acts of administration of the liquidators, of which, it is charged by plaintiff, the holder (Mr. Leake) of the $8,750 note had special knowledge.

We must say, with reference to this holder, that we have not found that he committed any act which goes toward impugning his or the good faith of those who acquired from or through him.

But returning to the liquidators.

They found the note among the papers of the bank. It had, as before stated, been deposited with the Clearing House Association.

Upon inquiry, they were informed that the parties, George A. and W. N. Louque, had business with the bank.

The notary made a note of it on the sheet of the inventory and carried it among the assets.

Inquiry was made in regard to this note.

We will have occasion, in more detail, to refer to this subject later in considering the issues.

Despite all that is said to the contrary, we are decidedly of the opinion that there was a missing link between the bank and Milliken & Farwell, to whom the note was paid. We will remain with the subject one moment longer to say that the note passed from Milliken & Farwell to George A. Louque, the maker—from Louque, who had paid it to the bank, as said by the cashier, to have the mortgage canceled; from the bank to Leake, who brought the action of foreclosure. It was, in any event, reissued paper. It went into the hands of the bank as such. It was past due when the defendant became the adjudicatee. It knew, or it must be held to have known, that the note was dishonored paper.

The bank began by securing itself to cover an overdraft, and, in securing the overdraft, found it possible to make a loan and to secure itself against danger of loss.

It then gave a check, secured as to its payment by the mortgage notes of $15,000.

The debtor called upon his creditor and paid the amount.

The notes taken as security were transferred to the portfolio of the bank, and the usual entry was made.

While regarding the other note, the entries did not show that it was taken up by the bank.

Upon reading the testimony of the officers of the bank, it clearly appears that this note never was surrendered as an account of the bank, or as one of its securities to secure the payment of a loan. It was handed to the cashier, he testified, in order to have the mortgage canceled. He placed it aside for the purpose. It was never canceled—an oversight, doubtless.

By the certification of a check, as before stated, the bank acquired no interest in it, as it was payable in the name of the debtor, Louque, to his creditor, Farwell.

It was returned to him (the debtor, Louque). It had matured, as to its payment, months before.

He had no authority to reissue it and make it binding as against third persons with an adverse interest.

[15] The rule is that matured paper cannot be reissued after payment.

It will be observed that this note, extinguished by payment, was in the hands of the debtor, who had no authority to give it new life. It was not acquired by third innocent persons.

With the evidence before us, we are unable to hold that it was ever acquired by the bank.

The testimony of the cashier of the bank in regard to the payment is clear and un-

equivocal. It leaves no room for doubt. He is plainly corroborated by the other officers, except the president, who, to some extent, differs in his statements from the other officers.

And, further, the president and W. N. Louque, brother of plaintiff's husband, do not agree in regard to a salient fact in matter of the payment of the note.

This is only mentioned to state that, considering the testimony of the officers of the bank, and to the extent that the testimony of the brother of plaintiff's husband is considered, the weight of the testimony is with plaintiff on this point.

Learned counsel comments upon the fact that the cashier testified that he is of a nervous temperament, and that the pass into which the bank had fallen financially was a shock from which he had scarcely recovered.

We do not infer that the cashier's mind was in the least affected.

He was, at the date he testified, a bookkeeper for one of the commercial firms of this city.

The note having been paid, as relates to reissuing this note, the following decisions are pertinent: Hill v. Hall, 4 Rob. 416. See, also, Walmsley v. Theus, 107 La. 424, 31 South. 869; Upton v. Adeline Sugar Factory Co., 109 La. 678, 33 South. 725; Pertuit v. Demare, 50 La. Ann. 906, 24 South. 681; Sentell v. Hewitt, 49 La. Ann. 1021, 22 South. 242; Gridley v. Conner, 4 Rob. 445; Succession of Norton, 18 La. Ann. 39; Schinkel v. Hanewinkel, 19 La. Ann. 260; Doll v. Rizotti, 20 La. Ann. 265, 96 Am. Dec. 399; Walker & Vaught v. Kimbrough, 23 La. Ann. 639; Hall, Rodd & Putnam v. Cachere, 25 La. Ann. 494; Schepp v. Smith, 35 La. Ann. 5, 8.

Beyond question, there was error committed in matter of the reissued note.

Its effect has received our careful attention; also the curative possibilities of the plea of estoppel interposed, and the defense of laches urged by defendant, have been considered.

Whether they have the effect claimed presents the important issue at this point.

Defendant has to meet the important principles: First. The precision and certainty required in commerce in matters relating to paper values. Second. The right under the statute safeguarding the property of married women.

With regard to the first, it is only necessary to say that the promise to pay money retains its full value as negotiable instrument by observing certain well-defined rules.

We have not found that there was strict business care shown—only as a matter of business, that which may happen to any one in taking up the matured note.

The defendant knew, or must be held to have known, that the property was owned by plaintiff, a married woman, and that to bind her it is necessary to show that she, or some one authorized by her, was a party in interest, contradictorily with whom the negotiable or value of the note was maintained.

Second. Paraphernal rights are not always subject to the pleasure of the husband. He cannot dispose of them as his own.

[9] A married woman may be estopped, but not by the conduct and utterances of her husband, who is not her agent and not authorized to represent her.

Unquestionably, the husband is estopped. He is thoroughly concluded, but not to the extent of affecting his wife's interest, who was not a party to his acts and utterances.

We have considered the serious ground urged as an estoppel, which is, in substance, that she by her silence acquiesced in the sale.

She was not at the sale; nor does it appear that she was informed as to the sale, its terms and conditions.

The property was not situated in the parish within whose limits plaintiff had her residence.

A married woman has never been held bound by estoppel if the property sold is situated away from the vicinity in which she resides, and she knew nothing of the sale.

### Plaintiff's Asserted Laches.

Learned counsel for defendant have cited and quoted from decisions in other jurisdictions regarding laches.

Under different laws and in accordance with other jurisprudence, these decisions are not pertinent. We will not review each of them that can be held as controlling or even persuasive.

As to our own decisions, laches, as considered in them, is of exceedingly limited scope.

As to delay which is not sufficient to be considered a prescription period, laches adds very little, particularly when a married woman pleads the statute for the protection of her paraphernal property.

We have found no decision directly pertinent.

This cause is not yet concluded, although it has received our best attention.

If any of our decisions should be hereafter found upon the subject, we will certainly pause and reconsider the point.

Just now, although thoroughly argued, we must say, that, with the light before us, neither the facts nor the law, in our opinion, can be so construed as to hold plaintiff's cause as concluded against her by her laches.

Further in regard to laches.

The defendant, through learned counsel, has argued, in substance, regarding the opportunity that plaintiff had to know and learn of the fact that the property had passed out of her possession and ownership, and that this knowledge was sufficient to charge her laches, as she did not act within reasonable time.

There was some delay—several years. She spoke to several attorneys. They did not at once take charge. Some declined to act.

As a witness, she mentions that she had no means to institute suit.

Regarding the owner's knowledge of disposition of his property illegally made, we have read the decisions cited by learned counsel for defendant. The strongest, doubtless, is the last cited, Shaffet v. Jackson, 14 La. Ann. 154.

The minor was represented by the curator ad hoc.

The court held that under article 116 of the Code Practice a minor could be thus represented. We gather from the whole case that over 10 years had elapsed since the sale. The plea of prescription had been interposed. In the preceding case, no such plea would have been sustained by the fact.

The laws of this state have never been prone to divest the married woman of her property because of some act of the husband, to which she was not a party.

Whether this sufficiently explains, it remains that her inactivity is not in itself laches.

[10] One of the penalties for waiting before suing is that the claim of defendant revived (there is no question at this point of a prescriptive title acquired by the 10 years' prescription); that would present another issue, not before us.

She cannot claim a benefit as growing out of her delay in suing. She could not wait just long enough to let the note prescribe and the mortgage perempt, and then, as it were, pounce upon the creditor and demand of him the property, adjudicated free of all claim.

The law, in effect, says to the creditor:

"You cannot wait just enough to avail yourself of prescription and then recover the property."

That would not be equitable, just, or right.

It is proper to state that it is not our intention to hold for an instant notice or fore-

closure should have been given to plaintiff. The pact de non alienando rendered notice to her unnecessary.

The matter of notice is referred to only to state that it is corroborative of her testimony that she knew nothing of the sale.

We will here state that there is an equitable principle that, where one of the persons must suffer a loss, the law throws the loss upon the one by whose negligence or fault the damage or loss is occasioned.

This principle would have application here, were it not that the negligence or fault of the husband cannot be imputed to the wife.

The mortgage notes, amounting to $15,000, must be reinstated, and the status quo prior to the foreclosure restored.

The mortgage revives under the authority of the decision in Factors' & Traders' Ins. Co. v. Murphy, 111 U. S. 743, 4 Sup. Ct. 679, 28 L. Ed. 582; New Orleans Insurance Association v. Labranche, 31 La. Ann. 839; St. Charles Street Co. v. Fairex, 46 La. Ann. 1030, 15 South. 421; Heirs of Wykoff v. Miller, 48 La. Ann. 483, 19 South. 478; Succession of Gohs, 37 La. Ann. 429; Dawson v. Thorpe, 39 La. Ann. 368, 1 South. 686.

The mortgage must be reinstated; but the defendant's insistence is that it is entitled to the whole place; that it has used the front of the plantation and covered the greater part of the place with permanent structures for railroad purposes.

With this view, we are unable to agree.

The defendant is entitled to continue in use, for railroad purposes, of all the property now in its possession and held by it for the purpose stated, upon paying for the value of the property.

This defendant's contention is that it includes the whole place. The evidence does not sustain defendant's point in regard to the use of the whole place for railroad purposes.

It is also contended that plaintiff's rights are not prejudiced for damages; that she is really not entitled to anything; and it would serve no purpose to set aside the sale. Be that as it may, we will not go one step further than to recognize the mortgage claim; for as to it we do not think that plaintiff, even if there be peremption or prescription on the face of the papers, can stand silently by, and successfully sue for the property, and receive it immediately after peremption and prescription, when she has contributed by her delay.

### The Extent of Plaintiff's Right.

[11] She asks to be placed in possession of the whole plantation as owner.

Under well-settled jurisprudence, she is entitled to the whole place, subject, however, to the right of servitude acquired by defendant.

That is, she has a right of possession as owner of the land not occupied by the railroad.

The defendant went into possession in good faith, and remained in possession, without objection, until this suit was brought.

Under repeated decisions, plaintiff cannot recover over and above the value of the land (now in possession of defendant for railroad use) at the time it went into the possession and use of the defendant.

This position is amply sustained by the following decisions: St. Julien v. Morgan's Railroad, 35 La. Ann. 924; McCutchen v. T. & Pa. R. R. Co., 118 La. 436, 43 South. 42; Railroad Co. v. City, 31 La. Ann. 478; Bourdier & Belisser v. Railroad Co., 35 La. Ann. 947; Day v. Railroad Co., 36 La. Ann. 244; Lawrence v. Railroad Co., 39 La. Ann. 427, 2 South. 69, 4 Am. St. Rep. 265; St. Julien v. Railroad Co., 39 La. Ann. 1063, 3 South. 280; Mitchell v. Railroad Co., 41 La. Ann. 363, 6 South. 522.

It was from that time that the right of recovering its value arose.

Delimitation at this time is not possible with any degree of certainty.

The case is remanded, in order that the question at this point may be decided.

Before concluding, we will refer to the point growing out of the fact before noted—that the defendant has parted with its possession by conveying the property to another railroad.

The plaintiff is not prejudiced by this conveyance. Her rights remain, and have been passed upon as if no transfer had been made, as, under the statute, it is as if there had been no transfer.

It is therefore ordered, adjudged, and decreed that plaintiff have judgment setting aside, avoiding, and reversing the judgment of the district court.

It is further ordered, adjudged, and decreed that plaintiff have judgment recognizing her as the owner of the Lafreniere plantation, less those tracts that have been disposed of and no longer form part of that plantation.

The proceedings in foreclosure are annulled.

That part of Lafreniere plantation in possession of defendant for the use of a railroad remains and continues in use of the defendant in the same way and to the same extent as it has been possessed, held, and used heretofore; i. e., since the railroad went into possession.

It is further ordered, adjudged, and decreed that the mortgage of defendant on Lafreniere plantation and its interest therein revive and become of full force and effect as an indebtedness secured by mortgage on Lafreniere plantation, and that it is not subject to the confusion heretofore existing; i. e., before the date of this judgment, and from the day that the property was adjudicated, as before stated.

It is decreed that the case be remanded, and that the question be decided in the district court; and the evidence to be heard is as to the extent, area, and number of acres in use by defendant for railroad purposes, and the value of the property thus used at the time that defendant went into possession.

It is further ordered, adjudged, and decreed that the value thus ascertained of all such property be deducted from the amount of the claim just mentioned as revived, keeping an account as to balances, and adjusting the claims and passing upon the issues thus presented.

[12] It is further ordered, adjudged, and decreed that the right of defendant to recover the value of improvements placed by it on the land not used for railroad purposes is reserved.

[13] It is further ordered, adjudged, and decreed that plaintiff's right, if any she has, for rental since the suit was filed is reserved.

It is further ordered, adjudged, and decreed that appellee pay the costs of appeal.

PROVOSTY, J., takes no part for reasons stated in separate document.

PROVOSTY, J. Not having heard the argument, I take no part in the decision of this case, although the parties have filed an agreement that I should do so. My reason is that the record and briefs are very voluminous, and the decision of the case depends upon an appreciation of the evidence, and that in these closing days of the session I could not give the case any special attention, without neglecting other cases already demanding my attention and having first claim upon it. Should there be an application for a rehearing, and the application not be disposed of at the present session, I shall feel obliged, under the said agreement of counsel, to participate in the consideration of the case.

On Rehearing.

BREAUX, C. J. This is the third time that this cause is before us. On the first appeal, the court discussed the different points presented on exceptions, and unanimously overruled the decision of the lower court and remanded the case. Same title as above, 122 La. 156, 47 South. 449.

On the second appeal, this court unanimously decided the main issues presented, and remanded the case for trial on different questions stated in the decree.

Both plaintiff and defendant complained of the judgment.

The court arrived at the conclusion that the whole case should be reopened and a full rehearing granted.

On this rehearing, defendant presented in argument a new point, not heretofore argued, and not even passed upon, and this new ground was never pleaded, except on the rehearing. This new ground is stated infra.

This court has repeatedly decided that issues must be timely filed, and that questions settled will not be reopened, and they are considered settled, unless the issue is timely urged.

There are a number of decisions upon the subject.

Quite recently this court held substantially that questions decided between the same parties regarding the same thing, after full consideration in all the aspects presented and embracing all the issues raised, are conclusive; that cases will not be reopened to consider issues not previously pleaded and argued. Succession of Turgeau, 58 South. 497,[1] handed down April 8, 1912. See, also, Boisse v. Dickson, 32 La. Ann. 1150; Paland v. Railroad, 44 La. Ann. 1006, 11 South. 707.

The Supreme Court of the United States expresses similar views upon the subject. See Clark v. Keith, 106 U. S. 464, 1 Sup. Ct. 568, 27 L. Ed. 302; Illinois v. Illinois Central, 184 U. S. 77, 22 Sup. Ct. 300, 46 L. Ed. 440.

[16] When the case was argued orally the last time, we were requested to go over the issues argued; otherwise an error would remain not reversed. We finally concluded to reconsider the issues, both those decided and the new point argued for the first time on the rehearing. The new point urged for the first time on rehearing was that the amount with which the $8,750 note was taken up was furnished by the bank, and that in consequence the bank was subrogated to the rights of the holders, Milliken & Farwell; in other words, that it was a payment by the bank with legal subrogation. At the beginning of the discussion, we state that which will not be denied: That it was certainly not a conventional subrogation, entered into between the bank and Milliken & Farwell; for the bank had nothing to do with that firm. There was no payment made by the bank to that firm. The bank negotiated exclusively with George Louque, who was not the agent of Milliken & Farwell, who had naught to do with nor for them; he was only the debtor of this firm of Milliken & Farwell, and was, doubtless, anxious to pay the amount due them and save his place from seizure and sale. There was no way of obtaining subrogation, except by a transfer by Milliken & Farwell to the bank. Louque was a third person; he had no interest to transfer. At this point this question occurs to us, Who transferred the note to the bank? Not Milliken & Farwell; for they knew nothing of the bank's interest in the matter. The certified check held by Louque was handed to Milliken & Farwell, and they handed him the note. The negotiation was entirely between Louque and the bank. Louque personally bore no business relations

---

[1] 130 La. 650.

to the bank, except, as a member of the firm of George A. and W. N. Louque, was its debtor. It remains that one cannot pay his own note and immediately thereafter subrogate his creditor to the note. There is no authority for holding that if a party to an instrument "pays it he can show that he was the secret agent." Louque was not even the secret agent of the bank, or of any one else. Secret agencies are not favored in commercial law; Louque was not even a secret agent. Daniel on Commercial Instruments, pp. 245, 246, 222, citing many decisions in support of the text.

The one who furnishes the money to take up the note must show that, directly or through an agent, it was taken up by him; that he paid it and became subrogated to the creditor.

Under our Code, a creditor who pays another, whose claim is preferred to his by reason of his privilege of mortgage, is subrogated. Civil Code, art. 2161.

The difficulty which confronts the defendant at this point is that the bank, creditor of George Louque and brother, did not pay Milliken & Farwell, creditors; but in reality it handed the amount to Louque.

At this point, in view of the importance of the issue, we determined to take up the particulars and details of the case.

Chas. A. Farwell, a well-known business man, who certainly knew the difference between the *payment* and the *transfer* of a note with subrogation, swore "that note [referring to the $8,750 note in question] was paid on the 24th day of February, 1896."

The note and interest at the date it was paid amounted to $10,889.38.

Louque took up this note with his certified check; i. e., certified by the Bank of Commerce. He delivered the check to Farwell. Had the bank intended to take up the note, it would have used its own assets to effect the payment, and would have paid with its own check in favor of the creditors of Milliken & Farwell.

Philip Schumaker testified that he said to George A. Louque at the time he found it strange that the bank certified a check for his personal account; he having no funds in bank. He said "he would have made arrangements on the check," referring, as we take it, to the mortgage for $15,000.

George A. Louque's account was closed entirely with the bank. He did not owe it anything. It was different with the firm of Louque & Louque. He met Louque afterward, who said to him that he had "paid his last mortgage note."

Now, as to the indebtedness of the firm of George A. Louque and W. N. Louque to the Bank of Commerce, it was, this witness testified, $4,000 or $5,000; i. e., an overdraft in that amount.

De Blanc, cashier, testified emphatically that the note was paid, and that it never was considered part of the assets of the bank, as the overdraft of George A. and W. N. Louque was covered by the mortgage note of $15,000, and not by the $8,750 note. De Blanc swore:

"But I remember when Mr. Nicholls handed me the note he said: 'There, take that note; that note is paid.' And I took it and put it on the file on my desk."

The following question was propounded to him:

"Q. Why did the bank lend George Louque the money that you speak of and receive the $15,000 mortgage notes?

"A. To pay the mortgage on the plantation, the balance due on the plantation on the first mortgage; to wipe it out [that was the $8,750 vendor's mortgage]; and to secure the bank, also, for the overdraft of George A. and W. N. Louque, referred to above. These notes were sufficient to cover these two."

Furthermore, he was asked:

"Did you have any security for the Louque overdraft in addition to the $15,000 mortgage notes?

"A. There were some rent notes of a man named Margot.

"Q. Do you remember the amount of those rent notes?

"A. In the line of a thousand dollars; I don't remember the figures.

"Q. Then, with the $15,000 mortgage notes, as a good mortgage, and a thousand dollars of Margot's notes, the bank was absolutely secured?

"A. Absolutely secured for every cent."

He adds that he and President Nicholls often spoke of the matter. Furthermore, he testified that the $10,889.38 check, before referred to, was his personal check on the Bank of Commerce, certified to by the bank, made payable to Milliken & Farwell. It was to clear that plantation. The check was charged to the individual account of George A. Louque.

Cashier De Blanc further testified that he gave directions to Bourgois, the bookkeeper, to note on the ledger:

"Secured by mortgage notes of $15,000."

As cashier, he kept the $15,000 mortgage notes in the portfolio of the bank, and he put the $8,750 note—

"on a clip that I had on my desk to have that mortgage [that is, the mortgage for $8,750] canceled at some future day; to send it up to Jefferson parish and have it canceled."

Asked why it was not canceled, his answer was:

"It did not bother us any. We had the note; knew it was paid; knew there was nothing on that plantation except the $15,000 mortgage notes, which we held; and we did not worry about it."

Further questioned:

"The security to secure these accounts of the Louques that you have testified to of George A. Louque and George A. and W. N. Louque, you held the $15,000 mortgage notes and the Margot notes for approximately $1,000?

"A. Yes, sir.

"Q. And you say that was abundant to protect the bank against the Louque indebtedness?

"A. Yes, sir.

"Q. Mr. De Blanc, did this note of $8,750, which George A. Louque paid to Milliken & Farwell, figure upon the books of the Bank of Commerce at all?

"A. Not at all.

"Q. Did it figure upon any of the books of the Bank of Commerce?

"A. Not a book in the Bank of Commerce.

"Q. Was it regarded by the bank officers as an asset?

"A. No, sir. We did not consider it anything. We just had it as a memorandum. We thought we would use it later, or just to cancel the mortgage. That was all we wanted it for.

"Q. Who kept the credit discount ledger or the note book?

"A. I did.

"Q. Who made the entries showing the notes that were discounted?

"A. I made them.

"Q. Who made the entries in the book showing what collaterals the bank held as security for debts due it?

"A. I did.

"Q. Are you positive that this $8,750 note never figured upon the books of the bank?

"A. Yes, sir; I am positive.

"Q. Did the $15,000 mortgage notes figure upon the books of the bank?

"A. Yes, sir.

"Q. As what?

"A. As collaterals to notes.

"Q. Now, to what notes were they collateral, and what were the circumstances under which the notes were given, if they were given?

"A. They were collateral to two notes, one of George A. and W. N. Louque for the firm's overdraft of $4,000 or $5,000, and the other for George A. Louque's individual overdraft, as it reads altogether of $8,750, plus interest, $10,-889.38."

This is corroborated by the figures in the quarterly statement of the bank, published by the Picayune at the time, to which the witness referred while testifying.

This witness also explains why it was that the note of George A. Louque for $10,889.38 was pledged to the Clearing House:

"There was a financial panic; it was in 1896, the year the Bank of Commerce failed. We pledged the note of George A. Louque, and with it we pledged the $15,000 of mortgage notes. I refer to the note [pledged] of George A. Louque."

Witness further states that the bank held a note of George A. Louque for $10,889.38. On the reverse of the note was the indorsement:

"This note was secured by fifteen-thousand dollars of mortgage."

In 1897 George A. Louque made a dation en paiement to his wife of Lafreniere plan-

tation. At the date of the dation en paie-ment, the note was secured as to its payment by mortgage and vendor's privilege on the plantation.

Mr. Charles A. Louque, a well-known attorney, testified as follows about the $8,750 note:

"In order to facilitate his raising the money for the purpose of taking up the vendor's lien note, which was then due, he [George A. Louque] executed a $15,000 mortgage note. Now, there was reported this affidavit that he made in favor of his wife; and, in order to make this mortgage a good mortgage, it was necessary for Mrs. Carmelite Louque to come and renounce all her paraphernal rights in the mortgage, which she did, although she was not exactly willing to do it. I had to explain to her that this mortgage was then a second mortgage; but I understood that it was made for the purpose of taking up and paying this Milliken note, and if she did not renounce her rights that they could not raise the money, and that this vendor's lien note was ahead of her anyhow, and they would seize and sell the plantation, and she would lose her claims and rights, and thereupon she signed this mortgage. 'She intervened in the act and signed the mortgage.' She renounced her paraphernal rights in order to enable George A. Louque to raise the money to pay the Milliken note. She knew the amount of the note at the time."

Thus it appears that from the first the understanding was that payment of the note was the purpose, and that understanding was consummated.

Questioned, he answers:

"Q. Do you remember anything about Mr. Nicholls stating to you that he would give them any additional amount for the purpose?

"A. No, sir; no additional money [he could not increase the overdraft before mentioned]. He never said anything like that. He said he would help them to take up the note if George A. Louque gave him that mortgage.

"The idea under which Mrs. Carmelite Louque signed this mortgage, which was a second mortgage (it was subsequent to the vendor's lien note) was that this second mortgage was to be used for the purpose of taking up the other note [the $8,750 note], secured by vendor's privilege."

We will here state that Mr. Henry Daspit, an expert accountant, swore that the $15,000 notes, as found in the portfolio, were held by the bank as collateral, and that the note for $8,750 was not a part of the overdraft; nor was it held as a collateral against the overdraft. Again, some time in the early part of the year 1896 (President Nicholls of the bank testified)—

"Messrs. Louque, doing business with our bank, were being pressed for payment by Mr. Richard Milliken, the holder of the vendor's note on the Lafreniere plantation, and came to me for advice. I advised them to place an additional mortgage on the plantation for a sum sufficient to pay the vendor's lien and other indebtedness of theirs. They did put a mortgage of $15,000."

The Messrs. Louque, above referred to, were partners of the firm of W. N. and George A. Louque, the *debtor to the bank at that particular time*—a debt on *an overdraft of some $4,000*, which the bank wished to secure, and which was afterward secured by the bank holding the $15,000 notes, which had been obtained as above stated. (Italics ours.)

[17] The partnership of Louque & Louque was a separate entity—distinct from George A. Louque, one of the partners. The creditor of Louque & Louque could not become subrogated to a claim due by George A. Louque personally.

If the bank had been a creditor of George A. Louque, it might have paid his debt and become subrogated to the right of the creditor, Milliken & Farwell; but the bank as a creditor of Louque & Louque could not acquire a personal debt of George A. Louque with subrogation. The parties are different.

The following is, as we think, unanswerable:

George Louque was not the debtor to the bank, but the firm of W. N. and G. A. Louque.

The president of the Bank of Commerce, defendants' witness, testified that—

"the batch of notes was placed in the hands of the cashier of the bank to secure the indebtedness of the Messrs. Louque."

The "Messrs. Louque" were the two partners before named. George Louque's ac-

PONS v. YAZOO & M. V. R. CO.

count with the bank had been closed for some time. He was not personally responsible for the overdraft held by the bank.

Schumaker, the paying teller, testified, and his evidence is:

"His account was closed in 1895; and after his account was closed there never was an account opened for him."

Legal subrogation takes place for the benefit of the creditor. As the bank was not the creditor of G. A. Louque, it did not become legally subrogated.

The partnership (the bank's debtor) was a separate entity from that of the partner personally.

The members of the firm and the firm are not the same. This court said, in Pike Bros. & Co. v. Hart & Hebert, 30 La. Ann. 868:

"The ideal thing, the partnership, is perfectly distinct from the individuals who compose it, and may have—indeed, always have—properties, rights, and obligations equally distinct that the law recognizes." C. C. arts. 2856, 2858, 2859.

In the Succession of Pilcher, 39 La. Ann. 364, 1 South. 929, the court said:

"The partnership is a moral being, distinct from the persons who compose it, not alone as regards the ownership of the partnership property, but as regards the creation of and liability for the partnership debts."

The court cited various cases in reaching this conclusion, and said, in the case of Smith v. McMicken, 3 La. Ann. 322:

"The partnership once formed and put into action becomes, in contemplation of law, a moral being, distinct from the persons who compose it. It is a civil person, which has its peculiar rights and attributes. Hence the partners are not the owners of the partnership property. The ideal being thus recognized by a fiction of the law is the owner; it has the right to control and administer the property, to make it fulfill its legal duties and obligations, and the respective persons are but owners."

It being very evident that it was the indebtedness of the partnership, a different person from the partner, the bank did not become the transferee of the note with sub-

rogation. There was no agreement about taking up the note. The weight of the testimony is: It was paid (subrogation is a fiction, and, as it is a fiction, there must be an article which authorizes it, and it arises only under the condition determined by law). See text, Laurent, p. 450, vol. 23.

The condition determined by law is that the one by whom the debt is paid is a creditor of the debtor whose debt he paid. C. C. art. 2159.

There is other evidence; but we will stop here.

Against all this testimony, the contention of defendant is that George A. Louque wrote a letter to Stuyvesant Fish, president, in which he acknowledged his indebtedness on the $8,750 vendor's privilege note.

At this point we will mention that in the year 1897 George A. Louque had made a dation en paiement to his wife. Lafreniere plantation, for valid consideration, had become her property. Subsequently, when George A. Louque wrote the letter, he had parted with all interest in the property. He, although not the agent of his wife, wrote to President Fish, soliciting time and asking that the property be not sacrificed by a sheriff's sale in foreclosure proceedings. He chose to refer to the $8,750 note as secured by vendor's privilege on Lafreniere, as well as the $15,000. The note was due, he in substance said.

At the time that the letter was offered in evidence, written by one who had lost all interest in the property, written by plaintiff's husband, objection was urged to the admissibility of the testimony, on the ground that it was the letter of the husband. The objection was overruled in error, and the testimony admitted. To this letter, if it amounts to anything, no effect can be given.

Conceding for a moment that the letter was admissible in evidence: Between this letter of the nervous debtor, Louque, at that

time doubtless anxious to protect his wife's place, which had become hers under the circumstances before stated, with the understanding that the renunciation of her paraphernal rights in the mortgage in question was given as before stated, and the unbroken line of testimony, which we have in part reproduced, we must adhere to the view unanimously reached.

Lastly upon the subject, as absolutely confirming our view, at the time that the check was certified by the bank, who handed it to Louque, the amount was assigned to the credit of Louque to pay the check.

Louque, in handing his check to Milliken & Farwell, gave them the right to collect this amount placed to his credit.

The payment as made precludes the idea of subrogation.

The next point we have considered relates to the occupancy of part of the land for railroad purposes. One of the purposes, we take it, in first buying the notes and afterward in becoming adjudicatees at sheriff's sale was to extend the railroad across Lafreniere plantation. In other words, for railroad purposes.

Plaintiff's very earnest contention is that defendant had acquired no right to this land, and must now deliver the place as a trespasser, without right, because a trespasser.

In addition to the views heretofore expressed upon the subject, we reiterate that defendant should not be treated as a trespasser. It must be remembered that the issue is exceptional. Let us consider for a moment one of the views that may be considered in deciding the case. A in good faith sells a tract of land to B, a vendee in good faith. After a time A discovers that there was no legal sale. He institutes suit for the property. B is condemned to return the property and A the price. B, being a vendee in good faith, claims the improvements. It happens that, owing to B's occupancy, the improvements are worth hundreds of thousands of dollars, but worth the amount to him personally. If B's claim for the value of the improvements were allowed, B would be at the mercy of A. A would be entirely unable to pay so large an amount for the improvements on the strip of land. In this instance, the length of the strip of land occupied by the railroad measures about 17 acres. Who, save the railroad, would wish to own 17 acres of railroad improvements? It would be of no value to him, although very valuable while forming part of a system.

The owner must look to the value of the property, and not to the property itself.

From Elliott we glean: Where it has constructed its road in good faith, without opposition by the owner, under color of title, it (the railroad) remains in possession. Elliott on Railroads (2d Ed.) 1058.

Plaintiff seeks to be relieved by contending that she did not know that the property was in the possession of the railroad. Her position in this respect is not sustained by the facts. She knew of the sale, and only realized some time after its date that she had a title. The case, instead of being different from those to which the statutes are intended to apply, falls within their provisions.

In regard to her knowledge of defendant's possession, we will state, in passing, that her brother-in-law, W. N. Louque, said to her in 1899 that the place had been sold. Mr. Pomes, an attorney at law, says, in substance, that she became aware of the sale some time after it had been made. With that knowledge, she cannot be entitled to the property and improvements without paying anything for the improvements. They were made without the least objection. It would be receiving property without the least consideration.

At this point we will notice, as relates to defendant, that it pleads the prescription

of one and two years. The question is one of title as relates to all property save that which has been taken possession of by the railroad for railroad purposes. The whole plantation cannot be subject to that prescription. As to the right of way and the prescription pleaded by defendant, the prescription cannot be of any avail; for there were no expropriation proceedings. This court has decided that prescription applies only in executory proceedings. Amet v Railroad, 117 La. 455, 41 South. 721.

As relates to good and bad faith, another issue: Learned counsel for defendant argue that good and bad faith are not issues in this case; that good faith arises in case of revindication against a claim for the property.

If it had been taken in bad faith, it might not be subject to the protection of the different statutes referred to above. But one is in bad faith who assumes to be the owner when he well knows that he has no title to the thing, or that the title is defective. Civil Code, art. 2432.

That knowledge has not been traced to the defendant that we have been able to find. There is no bad faith in fact, and no application for technical bad faith, as it is not shown that defendant was aware of any defect in its title. Good faith is always presumed. The error was one of fact, and not of law. Defendant's agent evidently thought that they owned a good and valid note, although past due.

As relates to the time at which the value of the property should be fixed:

We have not found it possible to fix any other time than the date hereafter stated in the decree.

The defendant and appellee, on the other hand, asks that the decree be enlarged as relates to drainage. We leave that question to be determined with other questions hereafter. We will state, none the less, that we adhere to the view that the railroad's possession includes the ditches on each side necessary to drainage, as decided in Moore v. Railroad Co., 126 La. 840, 53 South. 22, cited by defendant.

We would be pleased to terminate all the issues at this time; but the facts before us, taken as a whole, do not justify our extending our decision further.

As the majority of the court are divided in opinion as to the reconventional demand of the defendant based on the mortgage, of date January 2, 1896, for $15,000, executed by George A. Louque on the Lafreniere plantation, whatever rights the defendant may have in the premises will be reserved.

It is therefore ordered, adjudged, and decreed that the judgment below be reversed; and it is now ordered, adjudged, and decreed that the judicial sale of the Lafreniere plantation, made in August, 1898, in the executory proceedings entitled "Hunter C. Leake v. George A. Louque," No. 530 of the docket of the district court for the parish of Jefferson, state of Louisiana, be annulled and canceled on the records; and it is further ordered and decreed that the plaintiff, Mrs. Carmelite Pons, is the lawful owner of said Lafreniere plantation, as described and sold in said executory proceedings, subject to the reservations hereinafter set forth in this decree.

It is further ordered and decreed that defendant's right to retain possession of that portion of said plantation actually used and occupied by defendant, at the date of the institution of this suit, for necessary railroad purposes be recognized and enforced, on the condition, however, of paying to the plaintiff the market value of said portion, as of date August, 1898, with legal interest thereon from said date until paid.

It is further ordered that the right of defendant be reserved to recover the enhanced value of the remainder of said plantation

that may have resulted from any improvements and betterments thereon made by said defendant.

It is further ordered that the defendant's reconventional demand for $15,000 be reserved for future adjudication.

It is further ordered that whatever rights the plaintiff may have to recover rents and revenues be also reserved.

It is further ordered that our former decree, as thus amended, be made the final judgment of the court, and that this cause be remanded for further proceedings according to law and the foregoing provisions, and that the defendant pay costs in both courts.

SOMMERVILLE, J., takes no part.

See dissenting opinion of PROVOSTY, J., 59 South. 735.